J. Fred Carlson, Appellee, v. Marie Smith et al., Appellants.

No. 40314.

Pickett & Swisher, for appellants.

White & Clarke, for appellee.

FAVILLE, C. J.—On January 17, 1929, the appellee filed in the district court of Boone County, Iowa, a petition in equity asking to have a deed from the appellee to the appellant Marie Smith dated June 4, 1928, set aside.

For many years the appellee and his wife lived on a farm near Boone. Having no children of their own, they took into the family, when she was nine years of age, the appellant Marie Smith, who most if not all of the time thereafter passed under the name of Marie Carlson. She lived with the family until she was twenty-three, when she was married. While living with the Carlsons she was very active, not only in doing housework, but in assisting with the plowing, husking, milking, haying, and other general farm work, so long as the appellee lived on the farm. When Marie was about eighteen years of age, owing to the ill health of Mrs. Carlson, a home was established in Boone, where Marie lived, caring for Mrs. Carlson. After her marriage she was called to go with Mrs. Carlson to various hospitals and other places for medical relief and attention.

During this time the appellee remained on the farm. Marie frequently went out to the farm to work, returning to care for the house and Mrs. Carlson at the home in Boone at night. At the request of the Carlsons she, after her marriage, frequently was called to take care of Mrs. Carlson. At times she remained

as long as six or seven weeks at a time. Mrs. Carlson died February 6, 1928. In the meantime, Marie and her husband were living in Waterloo, where, at the time of the trial, they still lived.

It clearly appears that Marie worked very faithfully and very hard for the appellee and his wife. It also appears that not only before the death of his wife, but afterwards, appellee relied to a large extent upon Marie. When his wife died he immediately called Marie. As the appellee testified: ''She was the only one I had.'' Shortly after the death of his wife, appellee decided he wanted to make a trip to his native land, Sweden, and again he called Marie, asking her to come to pack his trunk and help him get ready to make the trip. This included doing his washing and mending, buying shirts, clothing, and other material for him, and in general getting him ready for the trip. It seems he lived alone and had not disposed of any of his wife's wardrobe. This he had concluded to take with him to Sweden and give to some of his relatives there. He wished Marie to come to pack these goods and prepare him for the trip. She arrived in Boone the day before Decoration Day, May 29th, and remained until June 9th.

The appellee left for Sweden on June 13th. What happened at Boone between the appellee and appellant during the time intervening between May 29th and June 9th is in dispute.

On Decoration Day the appellee and appellant visited the cemetery at Boone together. Regarding that day's occurrences the appellee testified in part as follows:

''As we were down there she began to talk about it, she says, now you are going to take a dangerous trip, you have to do something, you better do something, she said, and so I said, what, I didn't know about anything, I thought everything was all right. No, you got to do something. And she wouldn't leave me alone, she was after me that whole evening. * * * She says, 'You got to do something.' 'You got to get something done.' She says. 'Before you go.' She says, 'If you don't you are liable to have some trouble,' and so she says, 'I am the nearest to you'—I don't know how you are, I have a brother and a sister. But she said she would be so true to me as anything could be, and so she said if I would deed it to her, she didn't

say deed, she said if I would do something, some writing to her when I come back I could come and live with her or have them papers back and she just got me too excited, you know, I had my sorrow after my wife died, and I was just worked up, I didn't hardly know what I was doing. * * * Q. Mr. Carlson, you may tell the Court what she said, if anything, to you in reference to if you got back from Sweden, what she would do in reference to this property? A. She would give it right back to me. * * * She said it that night and she said it before we got the papers. * * * We talked it over the day before and the day before that and then I talked it over with my lawyer myself before she went along. * * * Q. What did she say? A. You are in danger every minute. Q. Is that what she told you? A. Yes, you are in danger every minute. * * * She wanted it done because she thought that somebody would sue me to get my property, I guess, and she thought she would protect me. * * * Q. What did she say in those conversations what she would do in case you got back from Sweden all right? A. Then she would turn it back. She would never have got it if it hadn't been for that. * * * Q. State whether or not you had confidence in what she would promise to do? A. I had all of the confidence I could have. I couldn't have had any more. Q. At that time did you state—state whether or not at that time you believed she would do what she said she would do? A. Sure. Q. Deed this property back to you when you got back from Sweden? A. I sure did.''

Referring to the execution and delivery of the deed at the office of the attorney who drew the same, the appellee testified:

''Q. Well, what was done there, go on and tell just what was done then? A. It was this way, that we come up there to have it done and she agreed to hand it back when I come back from Sweden and I don't know anything more. Q. And was that talked over in the lawyer's office? A. It was talked over in the lawyer's office. * * * Q. Yes, you answer my question I asked you what you done after you signed this deed and after Mr. Dyer put his seal on it? A. He held it in his hand like this (indicating) and she was sitting right about there and he says, 'When he comes back from Sweden you hand that back to him, will you?' And she says, 'Yes.' And after she said yes he

let her have it. After Mr. Dyer handed the deed to Mrs. Smith we left the office. I think we went home.''

Mr. Dyer, who drew the deed, testified:

''The conversation before the deed was drawn had to do with the—I supposed that a deed was what they wanted, I didn't know, and I got the description, I think in the first instance from some tax receipts Mr. Carlson had, but I believe I checked them later with the abstracter's books, I mean just by phoning, of the Boone County Abstract Company, that is the best description that I could get, then I went out to the outer room and prepared this deed and when I came in I read it over to them and began checking the description and said, is that the way it is to be and I was answered in the affirmative from somebody. I don't know who it was, and so I took it and just before I handed it to Mrs. Smith I said, 'It is your understanding that if Mr. Carlson gets back from Sweden all right you are to turn this back to him?' And she said, 'Yes.' And Mr. Carlson also said, 'Now you remember that, don't you Marie?' And she said, 'Yes, I remember it.' I remember that very distinctly. Q. Prior to that time do you remember, Mr. Dyer, whether there had been any talk in reference to the same matter of the property being conveyed back to Mr. Carlson in case he came back safely from Sweden? A. Yes, there had before I even prepared the deed. Q. And can you remember what was said in reference to that before you prepared the deed? A. Yes, sir. Q. Tell the Court what it was? A. Mr. Carlson said, 'Now, Marie, I am going to give this to you while I am gone.' And he says, 'When I get back you are going to give it back to me. You have got to give it back to me.' Q. What did she say? A. She said she would.''

Against this testimony is that of the appellant, as follows:

''He had not said anything at all about the deed or about having it signed over for his trip to Sweden. The only thing that had been said when I asked him not to go with women, but to let Mother at least get cold in her grave. And he had been going with this one woman some time then, and what his talk was with Mr. Dyer in the office I don't know and I never knew he had been to the office until Monday morning. * * * Q. And

he never during the nearly ten days you were there in his house said anything about his property? A. Not a word. * * * The day I went to Mr. Dyer's office with him there was some talk in my presence between Mr. Carlson and Mr. Dyer. Q. And was it before or after the deed was made out that you agreed in case he got back from Sweden alive that he was to have this property back? A. There was nothing asked about whether I agreed to do anything or anything, there never was a word said about signing any back. I heard Daddy testify. Q. Well now you testify before this court whether the man you call Daddy and Mr. Dyer had never said up there in the office anything about returning this property to Daddy if he got back from Sweden? A. He didn't say it to me. He asked Mr. Dyer if he couldn't put it in the paper where I would have to return it when he came back, if he could put that clause in the deed. Q. Did you offer to do that? A. I didn't say anything. Q. Were you objecting to that? A. No. Q. You were perfectly willing to do that? A. Yes.''

The foregoing is the substance of the material evidence on the vital issue in the case.

The deed contains the following recital:

''Reserving unto grantor herein the use, rents, and profits from to and in all of the above described property during his lifetime. The grantee in consideration hereof agrees to support, care for and maintain the grantor without charge during his lifetime if he so desires.''

After appellee's return from Sweden he requested a reconveyance of the property. This appellant refused and hence this suit.

The testimony of the parties in regard to the preliminary negotiations between them before going to the office of the lawyer, Mr. Dyer, to have the deed drawn, it may be contended is in conflict, but there is the testimony of the attorney as to what took place in his office in regard to the matter that clearly corroborates the testimony of the appellee and which stands unimpeached in this record. In fact, the testimony of the appellant herself as to the transaction in Dyer's office is largely corroborative of the testimony of the appellee and Dyer. The appellant herself concedes that at the time of the transaction and delivery

of the deed to her, the appellee *"asked Mr. Dyer if he couldn't put it in the paper where I would have to return it when he came back, if he could put that clause in the deed. Q. Did you offer to do that? A. I didn't say nothing. Q. Were you objecting to that? A. No. Q. You were perfectly willing to do that? A. Yes."* The appellant now contends in argument that her silence under these circumstances is a full denial of her consent to the agreement to return the property as claimed by the appellee. To this we cannot accede. She knew full well from the statements made by the appellee and by Dyer that it was the understanding of both of those parties that she was to hold the deed, and if the appellee returned from Sweden she was to revest the title to the property in him. It will not do to say that because she knew the other parties fully understood the matter in that way and that she remained silent, her silence is a denial of the understanding as to what the agreement was. Bruguier v. Goewey, 39 Iowa 190.

A court of equity will not lend its countenance to an evasion of the effect of a transaction of this character on the ground that one sitting by with full knowledge of the understanding of the opposite party, and accepting the delivery of the deed with such understanding, did not acquiesce therein because of mere silence. Courts of equity do not have their hands tied to effectuate justice under such circumstances, but will rightly hold the party to have acquiesced in the understanding of the opposite party where assent was manifested by the act of the party. The law applicable to cases of this kind is in no way doubtful in this state. We have stated it a number of times, perhaps no more aptly than in Stout v. Stout, 165 Iowa 552, wherein we said:

"The plaintiffs' contention is that from the whole transaction a constructive trust arose, and this claim is based upon the idea of a fraud, practiced by Margaret upon Elvis in the procuring of the deed, and the fraud consisted in the fact that she procured the deed from him by falsely promising and representing that she would hold the title to the land so conveyed in her own name until his death, and that, upon his death, she would pay to these plaintiffs the sums now asked by them to have recognized and enforced against her; that, at the time the deed was made and the promise given, there was no intent on

her part to keep the agreement; that there was an intent on her part, upon securing the title in this way, to repudiate the agreement and dispose of the land; and that, in pursuance of this intent and purpose so formed, she did dispose of the land to her children for the purpose of avoiding her obligation. The facts in this case bring it clearly within the rule announced in Bird v. Jacobus, 113 Iowa 194; Gregory v. Bowlsby, 115 Iowa 327.

"In the last case cited above it is said that, 'if * * * there was a fraudulent intent in procuring the deed without intention to hold the land as agreed, and, pursuant to that intent, the grantee disposed of the property, or otherwise repudiated his agreement, equity will take from the wrongdoer the fruit of his deceit by declaring a constructive trust,' and the party so receiving the title will be held a trustee *ex maleficio.*

"The ground and essence of the fraud is the existence of the intent, at the time of the promise, not to perform it, and we gather from this record not only that Margaret made the promises alleged to have been made by her, as an inducing cause to the conveyance, but also that she made them for the purpose of procuring this conveyance to her, with the intent in her mind at the time not to perform the promises, but to repudiate them, and thereby cut off and defeat the rights of these plaintiffs in their father's property."

In Wellman v. Wellman, 206 Iowa 445, we said:

"Competent proof of an express trust was not necessary, in this case. The rule is well settled that, where a conveyance of real property is made without consideration, and it appears from the circumstances that the grantee was not intended to take beneficially, or where the grantee accepts the conveyance from the grantor, knowing that it was not part of his intention to bestow a gift or to confer a benefit upon him, or where the conveyance is induced by fraud, a constructive trust arises, and the grantee will be deemed to hold the title in trust for the benefit of the beneficiaries intended. This is also true where the grantee obtains the title in himself, knowing the purpose of the grantor, but having no intention of carrying out such intention."

The evidence in this case comes squarely within the rule

announced in these and other similar cases. The trial court was fully justified in finding from the record that there existed the intent on the part of the appellant at the time of the delivery of the deed not to reconvey the property. Her conduct in soliciting the deed from the appellee in the manner in which she did was an inducing cause of the conveyance and was made by her for the purpose of procuring the conveyance to be made with the intent in her mind at the time not to perform the same in the event the appellee returned, but to repudiate said agreement and retain the property. Under such a situation equity uniformly establishes a constructive trust and holds the recipient of the property as a trustee *ex maleficio*. As bearing on the same proposition, see, Gregory v. Bowlsby, 115 Iowa 327; Newis v. Topper, 121 Iowa 433; Gregory v. Bowlsby, 126 Iowa 588; Revel v. Albert (Iowa), 162 N. W. 595 (not officially reported). There is a very extensive citation of authorities recognizing the rule, in 35 A. L. R., p. 280, and also in 26 R. C. L. 1233, and 39 L. R. A. (N. S.) 911.

II. Stress is placed upon the recitals of the deed with respect to consideration, to wit, that the appellant was to furnish a home for the appellee during his lifetime. Under the circumstances, it was perfectly obvious that it was desirable that the deed should recite a consideration. If, under the circumstances, the appellee had died in Sweden and it became impossible to carry out the terms of the constructive trust, and the heirs of the appellee had sought to attack the deed, it certainly was a matter of foresight and a wise provision to insert in the deed recitals of a consideration that would support it against the possibility of such an attack. Furthermore, even if there had been a consideration parted with at the time, all that equity would require would be a restoration of the *status quo,* but under the circumstances there was no parting with any consideration whatsoever.

In Stout v. Stout, supra, as shown by the record, the deed in question recited a consideration of. $7700, and it was held that there was a constructive trust created by the oral agreement entered into between the parties at the time of the execution of the deed. We reach the conclusion, under the record in this case and the well-established rules of law applicable there-

to, that a constructive trust was established which a court of equity should enforce.

The decree of the trial court was right, and it is—Affirmed.

EVANS, MORLING, STEVENS, and DE GRAFF, JJ., concur.

GRIMM, ALBERT, KINDIG, and WAGNER, JJ., dissent.

GRIMM, J. (dissenting)—Having given this entire record a very careful examination, I cannot concur in the majority opinion. To fully set forth my reasons would unduly extend the record. I will only refer to a few of the reasons which appear to me to be significant and which make the majority opinion incorrect.

In the first place, the original petition filed in this cause is based upon the theory, briefly stated, that Marie Smith frightened Carlson into making this deed, by making him believe that some of the women with whom he had been flirting were about to bring breach of promise suits against him.

In a substituted petition, filed by another attorney, it is claimed that Marie Smith secured the execution of the deed by frightening Carlson concerning the dangers of the voyage to Sweden, and then finally, the plaintiff changes front through still a third attorney, claiming that the facts constitute a constructive trust under which Marie Smith holds the title for the plaintiff Carlson.

Moreover, it is significant that Carlson went to his own attorney without the knowledge of Marie Smith and laid the whole matter before him and that on the following Monday, Carlson asked Marie Smith to go with him to the office of his attorney, that at that time Carlson brought to his attorney the remaining necessary information to have the deed drawn. Marie Smith did not even know that Carlson had been to see the attorney and had laid the whole matter before him.

The deed in controversy was prepared by Carlson's attorney, read over by Carlson and executed by Carlson before his attorney and acknowledged by him and then he took Marie Smith and together they went to the courthouse where the instrument was filed and recorded.

Out of the various inconsistent positions of the plaintiff in this suit, it can perhaps be stated that he now takes the position

finally that Marie perpetrated a fraud upon him at the time the deed was delivered to her in the office of plaintiff's attorney.

In order to sustain the majority opinion, the majority must find that in the office of Carlson's attorney, Marie, at the time she received the deed from Carlson, fraudulently determined in her own mind she would not give the title back to the plaintiff if he should demand it on his return from Sweden.

As I have read and re-read the record, I am unable to find any evidence upon which it can fairly and reasonably be said that Marie had any such fraudulent intention or thought in mind at the time she received the deed. Moreover, the record supports the theory that Carlson never intended that Marie should give him back the title to the property. The deed contains this clause:

"The grantee in consideration hereof agrees to support, care for and maintain the grantor without charge during his lifetime if he so desires."

There is in the instrument a complete reservation to the plaintiff of a life estate and the returns and profits of the land in question. There is evidence in the record from which it can be readily concluded that Carlson for some time after his return from Sweden intended to comply with these terms in the deed and make his home with Marie, but unfortunately for him and for all parties concerned, he went to Boone and he crossed the path of some designing women who, of course, cared nothing for him, but who anxiously craved the broad acres, the title to which he had conveyed to Marie.

There is evidence that Carlson had gone back to Boone from Waterloo for the purpose of renting his home and coming back to Waterloo to live with Marie.

As I read this record, the real test is whether at the time Marie accepted the deed in the attorney's office at Boone, assuming the plaintiff's story concerning a return of "the papers" is correct, she had intended and had in mind that she would not turn the property back to the plaintiff at any time. If she accepted the deed under such circumstances, it was accepted in fraud of the rights of the plaintiff. If the plaintiff has satisfactorily shown, as he is required to do under the established and well recognized rules, that she thus received the instrument,

a constructive trust is proven; otherwise, whatever other remedies, if any, the plaintiff may have, he is not entitled to relief in this action on the basis of a constructive trust. Manifestly, the burden of proving the fraud is on the party alleging it, and in order that the plaintiff can recover, this fraud must appear by clear, satisfactory and convincing evidence. It is not sufficient to warrant affirmance of this case to merely find on the record before us that Marie promised to turn back the land or, as they say in the record, "Give back the papers," and that Marie has failed and refused to do so. It is necessary to prove by clear, certain and convincing evidence one additional fact, to wit, that at the time she received the deed and promised to return "the papers" or the title, if she did so promise, she did not at that time intend to return the papers or the title, but that the promise was a part of a scheme whereby to fraudulently induce the delivery of the deed to her.

The plaintiff's own evidence is most unsatisfactory and inconsistent. The life estate and the contract for support is utterly inconsistent with the present position of the plaintiff and his attorneys that the deed in controversy was a mere temporary makeshift and protection against the death of the plaintiff on his trip to Sweden. Manifestly, if he did not return alive, the reservation of a life estate and contract for his support could be of no value whatsoever. It could be of value to the plaintiff only if he returned alive from Sweden, and, therefore, the insertion of these clauses in the deed are most eloquent and persuasive testimony in support of the position of Marie and in irreconcilable conflict with the testimony of the plaintiff and that which was offered in his behalf.

These solemn declarations in the instrument were written by the attorney selected and paid by the plaintiff, at a time when litigation was not in contemplation and long prior to the time when the plaintiff found the advisability, if not the necessity, of again becoming the title owner of this land in order to induce some one of his lady admirers to become his lawful wife. It very satisfactorily appears in the record that the plaintiff was fond of Marie and trusted her. She is the one upon whom he called in times of trouble and she always responded. She had lived with him and worked for him for many years, hard and faithfully. He had given her nothing, except a very meager

education and the bare necessities of life, during the time she lived with him. In his calm and serious moments and upon advice of counsel, he must have realized that in his declining years a perpetual home with the girl who had so faithfully served him and whom he trusted and admired, would be a very desirable thing, and a fair and reasonable compensation therefor would be giving to her the title to the property for her use after he passed away.

Undoubtedly, were it not for the well-known shortcomings of some aged men with fortunes, who are left widowers, this course would have been carried out to the end. It seems quite likely that if the importunities of designing women and the false heart throbs of old age had not interfered, he would have carried out the program. The record shows that Marie Smith stands ready, willing and able to furnish the plaintiff with support and a home, as specified in the deed.

The most consistent inference to be drawn from the entire record is that, in view of the long and faithful service of Marie to the plaintiff and his wife, the plaintiff's lack of children, his advanced years, his liking for and his confidence in Marie, and his prospective trip abroad to visit the home of his youth, in consultation with his attorney and as a result of his legal advice, the instrument containing an absolute conveyance and warranty with a reservation of a life estate, and the promise on the part of Marie to furnish him a home and support during his lifetime, was entered into in good faith on the part of the plaintiff and with the idea that when he returned from Sweden he would take up his abode with Marie, using the income of his farm and his other property as he might see fit, but that on his death Marie should have the title to the farm. The attorney must have known and understood, when he placed the life estate reservation and the contract for support in the deed, that the plaintiff so intended the transaction, and when the instrument was read by the plaintiff's own attorney to him in the presence of Marie and the plaintiff said he understood the document, the only reasonable conclusion to be drawn from the entire record is that the plaintiff did not then expect the return of the property. Certain it is the record does not support a finding that Marie Smith was guilty of such fraud as must be shown before we can hold that she is now a *trustee ex maleficio.*

244

At all events, the plaintiff has failed utterly to successfully carry the burden imposed upon him to satisfy this court that Marie Smith, at the time she received the deed in the office of plaintiff's attorney, had in mind and intended not to return "the papers" or the title to the property. Having so failed, the plaintiff cannot recover on the basis of a constructive trust. I would reverse.

ALBERT, KINDIG and WAGNER, JJ., join in this dissent.

REHEARING DENIED OCTOBER 31, 1931.