WENCIL RANCE, Appellee, v. ROY GADDIS and PERPETUAL SAVINGS AND LOAN ASSOCIATION, a Corporation, Appellants.

No. 43945.

MARCH 7, 1939.

R. S. Milner, for appellee and intervenor.

Crissman & Bleakley and W. W. Crissman, for appellant Perpetual Savings & Loan Association.

E. A. Johnson, for appellant Roy Gaddis.

BLISS, J.—This is a fraud case. It is the sordid story of the duplicity and depravity of a human male, and of the weakness and credulity of a foolish woman. Like most cases of fraud, the decisive questions are of fact and not of law. The decree of the able trial judge is amply sustained by the facts and the law. A somewhat detailed narration of these facts is necessary.

Bea Banks, the intervenor, in 1932, became the owner of a residence property in one of the better residence districts of Cedar Rapids. She married Ralph West, in June 1929, and divorced him in November 1932, in Wisconsin. He was a bootlegger and a rather violent character. In December 1932, she married Moorehead, in Illinois. Because the marriage was within one year after the Wisconsin decree and contrary to the statutes of Wisconsin, they became somewhat alarmed over their marital status, and together they consulted an attorney in Cedar Rapids, and Moorehead procured the divorce, in March 1933. She had paid $6,000 for the home and had expended approximately an equal amount in fixtures and furnishings. Sometime in 1933 she became acquainted with the appellee, Rance. She was then about thirty-six years old, and he about thirty-three. He was a bachelor living with his mother, and holding a responsible position with the Builders Material Company. They were together quite often and were very good friends. While her home and personal property were clear, she had no income, and the plaintiff advanced her money from time to time. Her ex-husband, West, made her considerable trouble with threats of various kinds, demands for money, and on one occasion came into her home and broke some of the furniture. Up to November 1933, Rance had loaned her $500, and it was apparent she would need more in the future. On November 16, 1933, they consulted E. J. Dahms, a lawyer in Cedar Rapids, whom she and Moorehead had consulted, and who represented Moorehead in the divorce action. She told Dahms that she wished to secure Rance with a mortgage. Dahms suggested that since Rance was going to loan her money as. she might need it, that the consideration of the mortgage be put at $1,100. She then suggested that it would be agreeable to her to give Rance a deed to her home, as security, particularly, as her former husband, West, would be less likely to bother her if she did not have title. Dahms then prepared, and she executed a straight warranty deed conveying her residence property to Rance, for a

stated consideration of one dollar and other valuable consideration. There is little, if any, dispute as to the above stated facts.

There is evidence tending to show the following facts: The intervenor met the appellant, Roy Gaddis, in March 1934, and in the following July, they began keeping company steadily. Gaddis professed his love for her and proposed marriage. The intervenor became very much infatuated with Gaddis and accepted his proposal of marriage. She then told him that Rance held a deed to her home as security, and Gaddis told her that Rance would beat her out of her property, and that since he was going to marry her, he wished to have the property in his name, and that he would protect the property and herself and Rance. The intervenor believed the promises of Gaddis, and, at his insistent demands, arranged a meeting of the two of them and Rance at the office of attorney Dahms. This meeting was held as arranged, on August 3, 1934, and at it Gaddis assured those present that if Rance would convey the property to him he would hold it as trustee for the intervenor and Rance, and that as soon as he and the intervenor returned from their wedding trip to Minneapolis he would pay Rance the $1,100 and interest which the intervenor was owing him. Relying upon the representations of Gaddis, and having faith in the intervenor, Rance agreed to this and at once executed and delivered to Gaddis a warranty deed, prepared by Dahms, conveying the property to Gaddis. Revenue stamps to the amount of $7 were affixed to the deed. No money or other consideration passed from Gaddis to either Rance or the intervenor at this meeting. The deed was filed for record on the day of its execution. That evening Gaddis and the intervenor went to Minneapolis in the former's automobile. Arriving at Minneapolis at an early morning hour, on Saturday, August 4th, they registered as Mr. and Mrs. Roy Gaddis, and immediately went to a room and went to bed. They continued in this relationship at the hotel until Monday afternoon, when they returned by automobile and arrived at Cedar Rapids on the morning of August 7th. They were not married on this trip. The next day, according to the testimony of the intervenor, Gaddis stated to her that it would look better for him, as a business man, if he also held title to her household goods. These had cost her in excess of $4,000. She had a dining room set for which she had paid $1,800, a bedroom suite costing $1,000, and a radio for which she spent $700.

On August 8, 1934, she executed a bill of sale conveying to Gaddis, "all my household goods and chattels now owned by me or located" in her home. She carried fire insurance for $10,000 on this personal property. He filed it for record at 4 o'clock p. m. on the same day. The intervenor testified that he paid her nothing for this property. Gaddis, at once, became active in seeking to procure a mortgage loan on the residence property. He first sought a loan at Waterloo. On August 10, 1934, he made written application to the appellant, Perpetual Savings & Loan Association, for a loan of $5,000 on this property. He also agreed to take fifty shares of stock in the association. In the application he stated that the property had been purchased in 1934 for $9,000 and that he had received wages in 1933 of $10,000. He testified that he filed no income tax return in 1934 for the year 1933 as he did not make enough above his exemptions. The appellant association's committee appraised the property at $6,800 and recommended a loan of $4,500. The application was accepted and on August 11, 1934, Gaddis executed a mortgage and note to the appellant association for $4,500, which was filed for record by it on August 13, 1934. The intervenor testified that she never gave Gaddis the abstract, but that he took it from her home. The next morning, Rance saw the report of the mortgage in the daily report published by the Linn County Abstract Company, and telephoned the intervenor that Gaddis had placed a $4,500 mortgage on her residence. She immediately went to the office of Attorney Dahms and told him of the mortgage. Both she and Dahms testified that the latter at once telephoned the appellant association to ascertain about the mortgage and one of its officers informed Dahms that it was true and that it had paid Gaddis $2,000 of the loan. Dahms then told the officer that he was giving the association notice for the intervenor that the property did not belong to Gaddis, that he had paid no consideration for it, that the intervenor was at all times in possession of it, and that he was giving the association fair warning so it could protect itself, and that if it paid another cent on the mortgage it would do so at its peril. The association had paid Gaddis $500 on August 11th, $1,500 on August 13th. After the claimed telephone notice from Dahms, it paid out the balance of $2,500 less some items of expense, to Gaddis on August 18,

1934, without making any further inquiry as to the rights of the intervenor, so far as the record discloses.

On the 14th day of August, the intervenor sent word to Gaddis to meet her at the German Village—a beer parlor and eating place. According to the intervenor, when she asked him, at this time, why he placed the mortgage on the home, he replied that he needed the money. He promised her to deed the property back and pay off the mortgage. She demanded the return of her household goods, and on the same day he executed to her a bill of sale of the same property which was included in her bill of sale to him. The intervenor saw him frequently for a short time thereafter, as she sought a return of her home, and he repeatedly promised to give the property back and to make the mortgage right, if she would keep away from attorneys. When he failed to do this, the appellee, Rance, on August 27, 1934, filed his petition in equity to quiet title in himself.

Before stating the version of the appellants as to what took place between these people, it will be informative and an aid in ascertaining the truth, to say something of the background of the appellant, Gaddis. He was about twenty-six years old in 1934. Shortly after his marriage he worked as a laborer in a tile factory at Fort Dodge. Then he was a tractor driver at South Bend. After about two years he returned to Fort Dodge and began sawing wood. He then had four children. In 1931 he divorced his wife and went to Dubuque and trucked meat into Chicago. For the next two years he operated a portable sawmill around Dubuque, Hopkinton, Zwingle and Amana. His children and their mother were with him. He testified: "After our divorce we lived apart a short time then she was engaged through a bargain between her and I as a housekeeper." By this "bargain" she had the responsibilities and obligations of wifehood without the name of wife. He remarried her on or about November 1934. During all of these years he never had a bank account. Most of the equipment which he bought was on time. During the first half of 1934 he operated his sawmill for the Webster Lumber Company of St. Paul. He had no capital and all expenses were paid by the company.

He testified that in July 1934, he had sold George Taylor, a dealer in fuel, some slabs, and incidentally inquired of him where he could buy a residence property. He said that Taylor knew of no such property. In explanation of the transaction by

which be obtained the deed from Rance, on August 3, 1934, Gaddis testified substantially as follows:—That within a few days after his inquiry of Taylor, which conversation Taylor testified never took place, he had a telephone call from the appellee, Rance, who was a complete stranger to him, stating that he had heard that Gaddis was in the market for a residence, and that he had such a property for sale, out on Bever avenue, and that the lady in charge (the intervenor) would be glad to show it to him. Gaddis said he was admitted to the house and taken through it by a woman whom he then saw for the first time. After he was overwhelmed with testimony to the contrary, he later testified that he had been "told" that he met her in March 1934, but that he had no such recollection as he and an uncle had drunk a quart and a pint of whisky that evening, and he was too intoxicated to have much memory of the occasion.

After a few other telephone negotiations with Rance, during which the latter reduced his price from $8,000 to $7.000, providing the payment was cash, the transaction was closed. Gaddis went to the seat of his sawing operations near Amana, where he had $7,000 or more concealed in the sawdust pile, and then to his home in Cedar Rapids, where he searched and found about $1,000 more which he had hidden away in odd places. That evening he and his housekeeper and his brother and his wife sorted and counted the $7,000—forty one hundred dollar bills and the remainder in tens and twenties. The money was wrapped in a newspaper and tied with twine—a package fifteen or eighteen inches long. By previous arrangement he was to meet Rance at Dahm's office to close the transaction, and he was to bring the intervenor with him to identify Rance. With the bundle of money and his identifier, he drove to the building where Dahms had his office. Rance was waiting at the street entrance. After he was duly introduced by a stranger to a stranger, the latter suggested that they go up to Dahm's office, but Gaddis said he would prefer to do business in the car. After dismissing the intervenor, they seated themselves in the front seat of the car, upwrapped the bundle and the money was counted—once by Gaddis, and twice by Rance. Rance then produced a warranty deed, signed, but not notarized. All blanks were filled in typewriting, except that for the name of the grantee, which was not filled. The recited consideration was

one dollar and other good and valuable consideration. Gaddis asked for the abstract of title. The instruments, being satisfactory to Gaddis, he accepted them and delivered the money wrapped and tied, to Rance. The intervenor, who was waiting, for some reason, accompanied Gaddis and Rance to the law office. There the deed was acknowledged, and the name of Gaddis was inserted as grantee, and revenue stamps affixed and the deal was closed. Gaddis said Rance asked him to pay for the revenue stamps, as he did not wish to break into the package.

The Gaddis version of the personal property transaction varies somewhat from the intervenor's. His counsel concedes that his client's conduct as shown by his own testimony "is in some respects unusual." Gaddis testified that the intervenor, without solicitation from him, asked him to buy her furniture and house furnishings, and, after demurring some, he offered her $800 in cash, which she accepted. This was on August 8th. On August 14th, he states that she asked him to resell this property to her, and after some haggling, and time to think it over, he consented to accept her offer of $1,000, providing it was in cash, as he had paid her cash. He was content with a modest profit of $200. The property had never left her possession. Such chivalry to the companion of his joys! He felt that he had been taken advantage of. In speaking of their Minneapolis trip, he testified:

"If she hadn't been there I wouldn't have been with her, it was her suggestion,—she was the moving spirit. *It commences to look like I was just her victim.*"

One might wonder if he did not also fool his veteran counsel, after reading paragraph 8 of his amended and substituted answer, filed February 21, 1936. (The trial began February 3, 1936.) This is the language of the pleader, duly verified by Gaddis:

"8. This defendant denies specially that he ever courted the said Bea Banks, or ever asked her to marry him, or that he ever promised to marry her; he admits, however, that he was impressionable and likewise that he was not immune, and that he became entangled in the net spread by the festive God and which net was the peculiar property and under the exclusive control of the said Bea Banks, and while so enmeshed, his

reason and sound judgment were unable to remain on guard for the protection of his just rights."

How he steeled himself "for the protection of his just rights" is further disclosed in his testimony relative to what his counsel describes as the "love jaunt" to Minneapolis. He said:

"After we got to Minneapolis on this 3rd of August trip, we did some drinking after we got there. I did not make any love to Bea Banks and did not put my arm around her and did not kiss her; I would not say that I never did do that, but I don't recall doing that after we got to Minneapolis. There were no demonstrations of love and affection between Bea Banks and me at any time in Minneapolis; there was no making love to her,—not a bit; there was no demonstration, hugging and kissing; I do not take the position that while Bea Banks and I were registered as man and wife at the hotel in Minneapolis, that there was no intimate relations between us. I admit the intimate relations; *I tell this court that these relations were absolutely cold and I understand your question, and you have stated my position correctly.*"

No doubt there are gradations among lechers. Some must be utterly more contemptible than others. He also became "enmeshed in the net spread by the festive God" in the person of a waitress, who was a witness for the appellants, and whose testimony varied greatly from previous statements made by her to others, according to their testimony. Further light on his character was his voluntary and wholly unprovoked besmirching of witnesses on both sides, when it was of no advantage to his cause. The wife of a railroad man had testified that she had seen him kissing the intervenor, in the presence of herself and a game warden companion of Gaddis. The game warden was a friend of Gaddis and a witness for him. He was married and the father of two children. Gaddis denied the testimony of the wife of the railroad man, and said that after a drinking party that night, he and the intervenor slept together, and then volunteered that the game warden and the railroad man's wife occupied the same room and bed until morning. Both of these persons, as witnesses in the case, denied this testimony of Gaddis.

After securing the proceeds of the mortgage, Gaddis deposited about $3,500 of it in the Merchants National Bank of Cedar Rapids and continued to make deposits therein until October 12th following. Thereafter he did his banking business with the Farmers Savings Bank of Walford, Iowa. He became indebted to this bank in the sum of $1,600 and gave a mortgage on much of his equipment and supplies to secure its payment.

He never paid any part of the $1,100 owing to Rance. The latter afterwards loaned that, or more, additional money to the intervenor. Later the appellee and intervenor were married. The testimony of the appellee and the intervenor was corroborated by other disinterested witnesses. The testimony for appellants was largely from interested witnesses.

The appellee first filed a petition against the appellants setting up the fraud herein stated and asking that Gaddis be decreed to have no right in the property, that the deed from the appellee to him, and the mortgage to the appellant association be canceled, and title to the property quieted in him. The intervenor filed a petition of intervention asking the same relief, except that the title be quieted in her subject to security rights of Rance. Later the appellee filed an amendment to his petition amplifying the charges of fraud on the part of Gaddis, and alleging the notice to and knowledge of the appellant association respecting the rights of the appellee and intervenor in the property, and asking judgment for damages against Gaddis for whatever part of the mortgage of the association, that was held to be a lien on the property.

The appellant, Gaddis, by amended and substituted answer denied the allegations of fraud, denied that he was to hold the title in trust for any one or for any purpose, alleged full knowledge and consent of the appellee and the intervenor to the sale to appellant, and knowledge of the appellee of the mortgage to the appellant association. The latter filed pleadings with allegations substantially like those of its co-appellant. Each prayed for the dismissal of the petitions of the appellee and intervenor. Appellee's reply was a general denial.

After the litigation was started the intervenor conveyed all of her right and title to the real estate to the appellee, and assigned to him all of her rights of recovery and interest in the litigation, so that the only parties to the suit, or interested therein are the appellee and the appellants.

■ I. It is the contention of the appellee that Gaddis fraudulently procured the deed of August 3, 1934, through false representations, false promises, and false pretenses, with the wrongful intention and purpose of cheating and defrauding both the appellee and the intervenor. He accomplished this by deceiving the intervenor as to his love for her, and his marital intentions toward her. He deceived her and the appellee by his false representations and assurances that he would hold title to the property solely as trustee for both of them and to protect her ownership in the property, and the appellee's security therein, when he had no such intention at the time he made the representations. That he had no such intention is evidenced by the fact that he immediately gave the appellant association a mortgage of $4,500 on the property. Because of this fraud, and the fraudulent intentions of Gaddis, a constructive trust was established, and Gaddis became a trustee ex maleficio. If the testimony adduced by the appellee is to be believed, and we are firmly convinced that the trial court was right in finding it to be true, then Gaddis parted with nothing in procuring the deed and the title to this property, and made his promises of trusteeship solely for the purpose of repudiating them as soon as he had acquired title. The principle of law contended for by the appellee has been settled doctrine in this state for many years. One of our latest pronouncements is that of Justice Anderson, in Eliason v. Stephens, 216 Iowa 601, 607, 246 N. W. 771, 774, in which the court said:

"The general rule is that fraud in the procurement of any written instrument vitiates it in the hands of one seeking to benefit thereby, and it is a familiar rule that fraud vitiates every transaction in which it enters, and that equity will interpose to prevent that which, if allowed, would work a manifest fraud, and it is unnecessary to cite authorities in support of these fundamental propositions. It is also true that equity will construct a trust where one, through actual fraud, abuse of confidence, or questionable means, gains something which in equity and good conscience he should not be permitted to hold.

"It is also a well-settled rule that if one person obtain a legal title to property, not only by fraud or by the violation of confidence or fiduciary relations, but in any other unconscionable manner, so that he cannot equitably retain the prop-

erty, which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner. Teuscher v. Gragg, 136 Okl. 129, 276 P. 753, 66 A. L. R. 143,149.

"And one who acquires property by fraud, misrepresentation, imposition, concealment, or under any other such circumstances as to render it inequitable for him to retain it, is in equity regarded as the trustee of the party who suffers by reason of the fraud or other wrong and who is equitably entitled to the property. Burgan v. Smith, 47 Iowa 286; Hall v. Doran, 13 Iowa 368; Henninger v. McGuire, 146 Iowa 270, 125 N. W. 180; Barnes v. Thuet, 116 Iowa 359, 89 N. W. 1085; Carlson v. Smith, 213 Iowa 231, 236 N. W. 387, 80 A. L. R. 186; Stout v. Stout, 165 Iowa 552, 146 N. W. 474, L. R. A. 1915A, 711."

After reference to, or quotation from, Wellman v. Wellman, 206 Iowa 445, 220 N. W. 82; Gregory v. Bowlsby, 115 Iowa 327, 88 N. W. 822; Bird v. Jacobus, 113 Iowa 194, 84 N. W. 1062; Stout v. Stout, 165 Iowa 552, 146 N. W. 474, L. R. A. 1915A, 711, and other authorities, speaking through Chief Justice Faville, we said, in Carlson v. Smith, 213 Iowa 231, 238, 236 N. W. 387, 390, 80 A. L. R. 186 (brief on pages 195 et seq.) :

"The evidence in this case comes squarely within the rule announced in these and other similar cases. The trial court was fully justified in finding from the record that there existed the intent on the part of the appellant at the time of the delivery of the deed not to reconvey the property. Her conduct in soliciting the deed from the appellee in the manner in which she did was an inducing cause of the conveyance and was made by her for the purpose of procuring the conveyance to be made with the intent in her mind at the time not to perform the same in the event the appellee returned, but to repudiate said agreement and retain the property. Under such a situation equity uniformly establishes a constructive trust and holds the recipient of the property as a trustee ex maleficio."

See, also, Neilly v. Hennessey, 208 Iowa 1338, 220 N. W. 47; 26 R. C. L. 1233-1243; 35 A. L. R. 280.

■ II. Appellants have also urged that it was error to consider parol testimony in establishing that the deed of November 16, 1933, from the intervenor to the appellee, was in fact a mortgage, and was so intended. We have heretofore held to the contrary. Neilly v. Hennessey, supra. King v. Cole, 188 Iowa 562, 176 N. W. 299; Kaldenberg v. Boyd, 196 Iowa 133, 194 N. W. 211; Bigler v. Jack, 114 Iowa 667, 87 N. W. 700; Fort v. Colby, 165 Iowa 95, 144 N. W. 393; Votaw & Hartshorn v. Diehl, 62 Iowa 676, 13 N. W. 757, 18 N. W. 305; Beroud v. Lyons, 85 Iowa 482, 52 N. W. 486; Bradford v. Helsell, 150 Iowa 732, 130 N. W. 908.

■ III. Appellants also insist that the appellee is precluded, as a matter of law, by the recital of consideration in the deed, of August 3, 1934, to Gaddis, that the latter took title thereunder in trust. This contention is without merit. Appellee is not claiming under an express trust, but under a constructive and ex maleficio trust—one arising from fraud. Where one obtains the confidence of another by false pretenses or false promises and robs and betrays that person, equity will not permit him to retain the fruits of his treachery, nor deprive itself of the use of parol testimony in order to accomplish that purpose.

In Carr v. Craig, 138 Iowa 526, at page 530, 116 N. W. 720, at page 722, the court, having held that a constructive trust had arisen, uses the following language:

"We see no difficulty about establishing such a trust obligation in a court of equity by parol evidence. Such evidence is not to be shut out on the ground that it tends to show an express trust in land in violation of the statute of frauds, but is admissible to establish a constructive trust, arising from the violation by the defendant of the confidence reposed in him by his own procurement, violation of which constituted a fraud. There is enough in this record to show that, while defendant induced plaintiff to allow him to acquire title to her land by foreclosure, by means of a promise to refund to her the money she had invested, his real intention was to acquire title, and hold it in violation of such agreement. This purpose is evidenced by his subsequent conduct. Under such circumstances a court of equity will treat the acts of the defendant as constructively fraudulent, and defeat his attempted wrong by im-

posing upon him a duty in the nature of a trust to carry out his agreement, although established only by parol evidence.''

In 26 R. C. L., sec. 79, p. 1233, it is said:

''79. Effect of Statute of Frauds and Statute of Trusts and Uses. It (the statute) has no application to cases where the law raises a constructive trust by reason of the fraudulent acts and purposes in procuring title to the land. The rule in equity always has been that the statute is not allowed to operate as a protection for a fraud, or as a means of seducing the unwary into a false confidence, whereby their intentions are thwarted or their interests are betrayed, and parol 'trusts in real estate have been frequently established in direct contradiction of the statute, on the ground of fraud. * * * The statutes of the various states relating to the creation of trusts in realty generally except from their operation trusts created by construction, implication or operation of law'' (as do the statutes of Iowa).

See, also, Stout v. Stout; Wellman v. Wellman; Carlson v. Smith; Gregory v. Bowlsby, all cited above, and Newis v. Topfer, 121 Iowa 433, 96 N. W. 905; Wahl v. Taylor, 176 Iowa 353, 157 N. W. 867.

IV. In order to defeat a title, regular on its face, by parol evidence of a constructive trust, the evidence must be clear and satisfactory. Carr v. Craig, supra; Fort v. Colby, 165 Iowa 95, 144 N. W. 393. Appellant argues that the appellee has not sustained this burden. It is our judgment that the evidence supporting the trial court's decree is very clear, satisfactory and convincing.

V. The Perpetual Savings & Loan Association appealed from the decree because it reduced the amount of the indebtedness secured by its mortgage from $4,500, the face of the note and mortgage, to $2,000, and canceled and reduced the lien of the mortgage on the property down to the amount of $2,000. The reason for this being that it had actual notice of the defective title of Gaddis, and of the adverse rights of the appellee and the intervenor, or such notice and knowledge of these adverse rights as would put a prudent person upon inquiry that would lead him to complete knowledge, and that after receiving this notice and knowledge, it ignored it, refused to make inquiry, and paid to the mortgagor the remainder of the loan, in the sum of $2,500.

It is a well-known principle of law that this appellant was affected with the knowledge of all the facts which a reasonable and diligent inquiry would have made known to it, and it must be presumed to have had that knowledge. Cook v. Chicago, B. & Q. R. Co., 40 Iowa 451; Johnson v. Chicago, B. & Q. R. Co., 202 Iowa 1282, 211 N. W. 842. The rule is and should be that if a prospective mortgagee has the notice or knowledge, above stated, of rights in the mortgaged property, adverse, prior, or superior to the right or title of the mortgagor, and then advances money to the mortgagor, it does so at its peril, and subject to any such superior rights or title. 2 Pomeroy Eq. Jur., 3d Ed., sections 659-665, section 646, sections 750 to 762; Norwood v. Parker, 208 Iowa 62, 224 N. W. 831; Millowners Mut. Life Ins. Co. v. Goff, 210 Iowa 1188, 232 N. W. 504; Aultman v. Kennedy, 114 Iowa 444, 87 N. W. 435, 89 Am. St. Rep. 373.

We have already set out the testimony relative to the notice to this appellant. Dahms advised it of the adverse claims of the appellee and intervenor on August 14, 1934. It paid the $2,500 to Gaddis on August 18, 1934. Bennett was the officer of appellant, to whom Dahms said he telephoned. Bennett did not testify that he did not receive this message. His testimony was of that kind, so familiar to courts and trial lawyers: "I don't remember. As far as my memory is concerned, I can't say. Well, I wouldn't care to say that such conversation did not take place because this is over a year and a half ago. I have closed over three hundred loans since then." We would put more credence in this testimony had not the same witness distinctly remembered telephoning Rance a few days before that the appellant was placing a loan on the property. Testimony of the kind given by Bennett is of no probative value. In Eckert and Vaughn v. Century Fire Insurance Co., 147 Iowa 507, 124 N. W. 170, in a similar situation, we held that the agent's testimony, that he had no recollection that insured informed him that there was a mortgage on the property, was not sufficient to create a conflict in the evidence. It appears on page 510, 124 N. W. on page 171, Eckert testified that, when Flynn was filling out the application, he answered that the property was incumbered. Flynn testified in the cause, but did not deny that Eckert had informed him of the mortgage. He did testify, however, that he had no recollection of being so informed and that as far as he could remember, his first

knowledge was received through a letter from the president of the company after the loss. This court said:

"We think the testimony of Flynn did not raise a conflict in the evidence on that point. The fact that he did not remember the conversations * * * would not necessarily tend to create such conflict. Nor would his further statement that, as far as he could remember, he did not know of the mortgage until after the fire."

In Pranger v. Pranger, 182 Iowa 639, at page 644, 164 N. W. 607, at page 609, a witness said: "I do not remember of having a conversation during the middle of February, 1904, with Ben and his wife or with Ben in the presence of his wife concerning the land."

We said in Eckert v. Century Fire Insurance Company, 147 Iowa 507, at page 510, 124 N. W. 170, at page 171, that such testimony—that is, that a witness had no recollection of a conversation—"did not raise a conflict in the evidence."

The evidence fully sustains the trial court on this issue. The appellant is in no position to complain. It had no right to shut its eyes and ears to the inlet of information, and then insist that it is a bona fide mortgagee without notice. Burwell's Admrs. v. Fauber, 21 Grattan, Va., 446, 463.

VI. There remains another matter. It appears that the trial court, on July 2, 1936, made certain findings on the calendar sheet, in this cause, which were entered of record in Volume 107 District Court Record, page 408. On page 222 of appellant's abstract, this entry is set out as the "Judgment and Decree." On September 6, 1938, the appellee filed in this court a denial of and amendment to the appellants' abstract, alleging that only as amended is said abstract true and correct. In this amendment the appellee denies that judgment and decree as set out by the appellants is in fact the judgment and decree of the court, but states that it was but a statement of the court's findings, and that the true judgment and decree was rendered on July 30, 1936, entered of record and the judgment and decree and the record thereof signed by the trial judge. Appellee sets out in his amendment both the findings and the final and enrolled judgment and decree. On November 3, 1938, the appellants filed in this court a motion to strike that part of the amend-

ment, on the ground that the judgment and decree of July 30, 1936, is null and void.

The entries as set out by appellee in his amendment to abstract is as follows:

"Appellee further amends said abstract by striking out all of Page 222 thereof and substituting therefor the following:

"On July 2, 1936, the Court made and entered in the calendar sheet certain findings which were thereupon duly entered and spread of record in District Court records Vol. 107, P. 408, in said cause as follows:

" 'The Court finds that the equities in this cause as between the plaintiff, Wencil Rance, and the defendant, Roy Gaddis, on account of the fraud committed by the defendant, Roy Gaddis, are with the plaintiff; and it is ordered that the title to the property in question be quieted in Wencil Rance as against the defendants Roy Gaddis and wife;

" 'As between the plaintiff, Wencil Rance, and the defendant, Perpetual Savings & Loan Association, it is the finding of the Court that the equities are with the Perpetual Savings & Loan Association as to the first payment, $2,000.00, made by the Perpetual Savings & Loan Association to the defendant Gaddis, and that the lien of the mortgage as to $2,000.00 is confirmed.

" 'As to the remainder, $2,500.00, of the mortgage, it is the finding of the Court that the Perpetual Savings & Loan Association had sufficient notice to warn it from paying out this sum of $2,500.00, and the Perpetual Savings & Loan Association is directed to release $2,500.00 from the lien of this mortgage or else a decree will be entered cancelling that amount.

" 'Judgment will be entered against the defendants, Roy Gaddis and wife, for the whole amount of the costs, but against the Perpetual Savings & Loan Association only for the fees of the witnesses called by it.'

"To all of which all parties except.

"Thereafter, on July 30, 1936, it being a day of the May, 1936, Term of the District Court of Linn County, Iowa, there was duly entered in said cause upon the calendar sheet, the following, to-wit:

" '7-30-36—Final decree as per enrolled decree of this date.'

548

"And on the same date, to-wit, July 30, 1936, it being a day of the May, 1936, Term of the District Court of Linn County, Iowa, there was duly signed by the Court and filed in said Court and cause, the following

JUDGMENT AND DECREE

which said judgment and decree was duly entered and spread of record in Vol. 106 of the District Court records of Linn County, Iowa, Page 299, to-wit:

"Now, to wit, this 30th day of July, 1936, it being a day of the regular May 1936 Term of the District Court of Iowa, in and for Linn County, there were present the Honorable John T. Moffit, Judge, the clerk, sheriff and other officers of the court. The court finds that heretofore at the January A. D. 1936 Term of this court, the above entitled cause came on for trial and hearing before the court upon the introduction of evidence and the arguments of counsel, and that the cause was finally submitted and taken under advisement by the court.

"That on July 2nd, 1936, it being a day of the regular May 1936 Term of the above court, the court made and entered its findings of fact and conclusions as to facts and law in said cause, which were duly entered in the calendar and to which reference is hereby made.

"AND NOW, to-wit, this 30th day of July, 1936, it still being a day of the regular May 1936 Term of said court, as aforesaid, this cause comes on for final decree and judgment upon the final submission, as aforesaid, and upon the findings and conclusions of fact and law, as aforesaid, under date of July 2nd, 1936, and being fully advised in the premises, the court finds and so adjudges that it has jurisdiction of the parties to this cause and of the subject matter thereof, and that the equities are with the plaintiff as against the Defendant, Roy Gaddis, and partially with the plaintiff as against the Defendant, Perpetual Savings & Loan Association, and partly in favor of the Defendant, Perpetual Savings & Loan Association as against the plaintiff, as more particularly set forth herein. * * *

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that by reason of the fraud and misrepresentations of the Defendant, Roy Gaddis, and because of his fraudulent acts and conduct, all as alleged in plaintiff's pleadings, that the said Roy Gaddis, defendant as aforesaid, has damaged plaintiff in the

sum and amount of Two Thousand Dollars ($2,000.00), with interest thereon from and after the 11th day of August, 1934, and that by reason thereof he is indebted to plaintiff in said amount, and that by reason thereof plaintiff is given a judgment against the defendant, Roy Gaddis, as follows, to-wit, that it is hereby ORDERED, ADJUDGED AND DECREED that plaintiff have and recover of, from and against the Defendant, Roy Gaddis, the sum of Two Thousand Dollars, ($2,000.00), the same to bear interest at six percent (6%) per annum from and after the 11th day of August, 1934, together with costs and accruing costs, and judgment is hereby entered against the defendant, Roy Gaddis, in favor of plaintiff, accordingly, and execution to issue therefor. The costs assessed against the defendant, Roy Gaddis, and to be taxed by the clerk and which are included in the foregoing judgment, shall be and are the whole amount of taxable costs in this suit except as to witnesses called by the Perpetual Savings & Loan Association, and as to such costs judgment is entered against the Defendant, Perpetual Savings & Loan Association.

"All parties to this suit except to the above and foregoing.
"DONE IN OPEN COURT AND BY THE COURT.

"John T. Moffit
"Judge of the Eighteenth
Judicial District of Iowa."

Appellants' motion to strike from the amendment to the abstract is not the proper procedure. Appellee had made a specific denial of the correctness of appellants' abstract. The proper way for the appellants to have taken issue was to have had the record in question certified to this court, as provided by Rule 17 of this court's rules.

The appellants, however, are in no way harmed by this error, since the entire questioned record is set out in the amendment, and must be taken by us as correct, since it is not impeached by a certified record. The issue raised by the appellants can therefore be determined on its merits.

It is apparent from the language of the court's notations on the calendar sheet that he was merely making a memorandum of his findings of fact to be used as a guide in the preparation of a more definite and detailed final decree. The decree was to be a link in the chain of title to real estate. The

title was to be quieted in Rance. A description of the real estate should appear in such a decree. The court must have intended to cover that in his final decree. The memorandum recites that unless the appellant association release the property from the lien of its mortgage to the extent of $2,500, "a decree *will be entered* cancelling that amount." This clearly indicates future attention in a final decree. The final part of the memorandum states: "Judgment *will be entered* against the defendants." This denotes something more that the court would do in the future.

This memorandum or findings of fact was not signed by the judge, nor was the record made thereof by the clerk of the court signed by the judge.

It is true that such a calendar memorandum may be sufficient basis for a judgment entry by the clerk in the proper record, *when approved.* But this memorandum or record was never approved by the judge. Kuhlman v. Wieben, 129 Iowa 188, 105 N. W. 445, 2 L. R. A. (N. S.) 666. The fact that the trial judge did not sign or approve the record entry of July 3d, but did prepare a final decree and did sign the recorded entry thereof, is convincing proof that he did not intend the calendar memorandum to be a final decree.

The recitations in the final decree state that entries on the calendar sheet were only findings and conclusions preparatory to the final decree.

Section 10801 of the 1935 Iowa Code is:

"The record aforesaid is under the control of the court, and may be amended, or any entry therein expunged, at any time during the term at which it is made, or before it is signed by the judge."

Both entries were made at the same term of court, and the record was not signed until after the complete entry of the final and enrolled judgment and decree of July 30th.

A case very much in point in its facts and decision, is Hess v. Hess, 184 Iowa 796, 169 N. W. 111. On November 3d the court made a finding on the calendar of the same nature as was made in this case, to which exceptions were noted as in this case. This finding was as follows:

"Court finds for the plaintiff, Mary Hess, and that she

was the lawful wife of J. O.Hess, and is his widow (see decree), to all of which defendant administrator excepts.''

On the 10th day of November, and at the same term of court, a final enrolled and signed decree was entered.

In the Hess case it was claimed that the entry above set out constituted the final judgment, so that a motion for a new trial would have to be filed within three days from November 3d, rather than within three days from November 10th, when the final judgment and decree was filed.

In deciding this matter, this court used the following language, which is equally applicable to the situation involved in the case at bar:

''This calendar entry was copied into the district court record by the clerk. This is the record upon which the appellant relies as being the final judgment; whereas, the appellee relies upon an enrolled decree, which was filed later, on November 10th, and duly spread upon the records of the court. This appears to be the net result of the conflict in the abstracts of the parties. Doubtless a calendar entry, spread upon the district court records, may be sufficient as a final judgment. But it is not necessarily such, nor does it terminate the jurisdiction of the court to cause to be entered a more extended and enrolled decree as the final judgment. In this case, the calendar entry made parenthetical reference to such proposed decree, as being either in existence or in contemplation. True, the enrolled decree purported on its face to have been made on November 3d. In this respect, it was in accord with the calendar entry as to date; but it appears that it was not, in fact, filed with the clerk until November 10th, and was, therefore, not entered of record prior to such date. The record of this enrolled decree was the final judgment, and the defendant was entitled to file a motion for a new trial within three days thereafter. Such was the view of the trial court.''

In the Hess case it is to be noted that the calendar entry said ''see decree''.

In the case at bar it is to be noted that the calendar entry said ''or else a decree will be entered.''

If the appellants desired any correction of the trial court record, they should have there moved to correct or ex-

punge, and not in the appellate court. Educational Film Exchanges v. Thornburg, 217 Iowa 178, 251 N. W. 66; Coggon State Bank v. Woods, 212 Iowa 1388, 238 N. W. 448; Jamison v. McCormick, 172 Iowa 666, 154 N. W. 898; Gardner v. Burlington Ry., 68 Iowa 588, 27 N. W. 768. As stated in Jamison v. McCormick, supra [172 Iowa 675, 154 N. W. 900], "the record to be presented here must be made there. The record made there canot be avoided here."

The appellant association has no cause to complain because of the judgment entry as both are the same with respect to it. In the final decree the court entered personal judgment against Gaddis. This was justified by the pleadings, the prayer of the amended petition, and by the record. Certainly if his fraud justified the purely equitable relief decreed, it was imperative that judgment for damages should be entered against him.

The judgment and decree, in all its provisions, must be and is affirmed.—Affirmed.

Chief JUSTICE and all JUSTICES concur.