WILLIAM P. STODDARD, Administrator, Appellant, v. MILO J. GABRIEL et al., Appellees.

No. 46463.

JUNE 6, 1944.

REHEARING DENIED SEPTEMBER 23, 1944.

W. F. Murphy, of Iowa City, for appellant.

Ottesen & Ottesen, of Davenport, and George E. Farmer, of Cedar Rapids, for appellees.

OLIVER, J.—Plaintiff's petitions alleged defendants secured from decedent a deed to a certain house and lot in Muscatine, thereafter sold by defendants for $750, also $486.67 in cash and two trust certificates of closed banks representing deposits of $1,424.83; that there was no delivery to defendants of the personalty nor of the deed to the real estate; that the deed was invalid for lack of consideration and because of decedent's incompetency; that the securing of said property was unconscionable and an unjust enrichment of defendants; that defendants were entitled to $327.61 for their services in caring for decedent and expenditures for his burial. Judgment was prayed for $909.26, and in addition thereto for $1,424.83, or for the possession of the bank certificates with the understanding that if any payments had been made thereon said sums should be added to plaintiff's judgment. The suit was started as a law action but upon motion of defendants was ordered changed to equity. Thereafter, plaintiff filed an amended and substituted petition, which omitted some of the allegations of his original petition and modified others.

Defendants have charge of the Grand Charity Fund of the Grand Lodge of Iowa of A. F. and A. M., and the Masonic Sanitarium of said Grand Lodge, at Bettendorf, Iowa, under certain rules and regulations of said Grand Lodge. The parties stipulated that the Grand Charity Fund was a charitable trust. Under the rules, only those Masons or their dependents who are indigent and physically ill are eligible for admittance to the sanitarium. It costs the Grand Charity Fund about $110 per month to maintain each patient at the sanitarium. Application for admission must be made by the lodge to which the applicant

belongs. One who has assets will not be admitted unless he will transfer the same to the Grand Charity Fund for his care, keep, and burial. When that is done, he is to be cared for as long as he lives.

Decedent, a retired merchant, living at Muscatine, was born in 1846, and had been a member of an Iowa City lodge of Masons since 1868. About April 19,1937, he wrote the secretary of the Iowa City lodge:

"I am in need of help and sick * * * living alone * * * for the past seventeen years. My wife died in 1920. * * * Could I be entitled to enter the hospital at Bettendorf? I am not financially able to pay my way at a private hospital."

Shortly thereafter, the Iowa City lodge applied for decedent's admission to the sanitarium. The application contained a statement by decedent which recited in part that he had been unable to work for five years; that his income was from a house in Muscatine and dividends from closed banks; that his children, William Stoddard, of Iowa City, and Emma Elliot, of Oregon, were in poor circumstances, and unable to support him; that he had not agreed to dispose of his property (unless to the Iowa City lodge, or the sanitarium), and that he was familiar with and agreed to abide by the rules and regulations of the sanitarium.

The application also contained the report of a doctor who had examined decedent; and certain certificates of the Iowa City lodge.

April 24, 1937, the board approved the application with the notation, "He to deed property to G. L. C." (Grand Lodge Charity Fund).

Shortly thereafter, Mr. Weeber, secretary of the Iowa City lodge, called upon decedent at Muscatine. They discussed the requirement that decedent turn over his assets for his care at the sanitarium. Decedent mentioned his postal-savings account, bank certificates, and house and lot in Muscatine. He also mentioned some land in South Dakota but did not consider he had much equity in it. Mr. Weeber and Mr. Wilford, secretary of the Muscatine lodge, called on decedent again in November 1937, and discussed with decedent arrangements for him to cash his postal savings, to assign his bank certificates, and to execute a

deed for the Muscatine property. That was agreeable to decedent and he decided to go to the sanitarium under the provisions made by the board. Mr. Wilford testified decedent's "own interpretation was to let the Masons take care of him the rest of his life and they could have what he had." December 21, 1937, decedent wrote Mr. Wilford, "I am ready to go to the sanitarium at Bettendorf now."

Decedent went to the Bettendorf sanitarium December 28, 1937. After riding from his house to the business section of Muscatine, he went to his bank alone and secured his papers, then went to the post office alone and apparently drew his postal savings. He then took the money and the papers to the office of Mr. Drake, a lawyer friend to whom he had previously said, "he wanted to convey his property to the Masonic Lodge so he might enter their old men's home in Bettendorf."

Mr. Drake prepared a deed to the Muscatine property and assignments of the bank certificates to board of trustees of the Grand Charity Fund. Decedent executed these instruments, acknowledged the execution of the deed, and they were handed to Mr. Wilford, who accompanied decedent to Bettendorf, and delivered them to Mr. Treat, secretary of the board of trustees and superintendent of the sanitarium. Thereafter, the deed was recorded.

Soon after decedent entered the sanitarium a medical examination indicated he required an operation. He was removed to St. Luke's Hospital for that purpose. However, on instructions of the surgeon, he was later returned to the sanitarium and the operation deferred until he should gain sufficient strength that he would have a reasonable chance of recovering from it. He died there January 28, 1938. In accordance with his expressed desire, he was buried in Washington County, Iowa. Defendants paid the burial expenses and the cost of an inscription upon the family monument requested by his heirs.

I. Appellant assigns as error the order changing the case from law to equity. The prayer was for a money judgment. However, it is the rule that the prayer alone is not necessarily determinative of the question whether the action is at law or in equity. From plaintiff's pleadings it appears he sought to

establish and enforce a constructive trust and an accounting from the trustees of such trust. Hence, the order changing the case to equity was not erroneous. Frink v. Commercial Bank, 195 Iowa 1011, 191 N. W. 513; McAnulty v. Peisen, 208 Iowa 625, 226 N. W. 144; Markworth v. State Savings Bank, 212 Iowa 954, 237 N. W. 471; Rance v. Gaddis, 226 Iowa 531, 541, 542, 284 N. W. 468, 473, 474.

■ II. The only evidence tending to establish appellant's contention that decedent was mentally incompetent was in the form of answers by Dr. Parks to hypothetical questions. Apparently, Dr. Parks was not acquainted with decedent. The principal basis for such hypothetical questions was the testimony of appellant, William P. Stoddard, of which the decree states:

"Considering plaintiff's interest in the case, his manner of testifying, and his apparent and admitted lack of definite recollection as to many of the things about which he testified, the Court is forced to reject his testimony as a satisfactory basis for the expert testimony of Dr. Parks."

On the other hand, seven witnesses, two of them physicians and surgeons who had examined decedent, testified that, in their opinions, he was of sound mind. In the language of some of the witnesses, "he had a mind as keen as the average man of 35 or 40, so far as handling his own affairs. He had a keen memory." "He was an old man but his mental condition was very good for a man of his age."

The finding of the trial court that appellant had failed to establish decedent's mental incompetency is sustained by the decided weight of the evidence.

Nor does the record sustain appellant's charge of want of consideration for the transfer of decedent's assets or that the same were not delivered to appellees. The arrangement was that he be admitted to the sanitarium and be cared for there so long as he lived unless discharged for a just cause. Assuming consideration was required, that would furnish adequate consideration for the transfer.

There is ample affirmative testimony of the delivery of the deed and the two bank certificates to the secretary of the board

 1371

of trustees. That decedent's money was received by the sanitarium is conceded. The following stipulation is explanatory of that matter:

"Iowa City Lodge No. 4 advised the defendants that it did not care to assume responsibility for the burial of James L. Stoddard as provided by said application [made by that lodge for his admission to the sanitarium] and advised further that the said James L. Stoddard had certain funds which he had saved for the purpose of paying his burial expenses and said defendants thereupon notified said lodge that in order to avoid complications said trustees would accept said deposits and assume responsibility for the burial of James L. Stoddard."

The cash realized from the assets received by the Grand Charity Fund was $1,524.47. This includes the dividends paid on the certificates of deposit of the insolvent banks prior to June 1943. There may be some further dividends. After deducting burial expenses, the cost of caring for this ninety-one-year-old man for twelve or fifteen months at $110 per month would have equalled the amount received from him. His admission to the sanitarium appears to have been regarded by the trustees as an act of charity toward a member of the order. Neither they nor the decedent considered the matter as an ordinary business transaction. Apparently, there was no thought of profit. That the fund received more than it expended was because decedent died sooner than anyone expected. There was no evidence indicating overreaching or unjust enrichment.—Affirmed.

All JUSTICES concur.