LINDLEY V. MARTINDALE et al.

1. **Trust:** WHEN IMPLIED. Where a husband buys land with his wife's money, and, without her knowledge, has the deed made to their son, the law will imply a trust in her behalf.

2. **Real Estate:** NOTICE OF TITLE FROM POSSESSION: WHEN RULE DOES NOT HOLD. The rule, that the purchaser of real estate takes the same charged with notice of the equities of the parties in possession at the time of the purchase, is well settled in this state (see *Phillips v. Blair*, 38 Iowa, 649); but such possession must affirmatively appear to have been open, visible, exclusive and unambiguous—such as is not liable to be misunderstood or misconstrued. And where the title of the lands was in a son of plaintiff, who resided on a portion of them, while plaintiff with her husband resided on another portion, and the lands had for a long time been cared for either by the husband or son, *held* that one who, upon being told that the title was all right in the son, took a mortgage from the son to secure a loan which was used for the most part to pay off prior encumbrances placed on the land by the son, was not charged with the alleged equities of plaintiff by reason of her claimed possession of the land. Her possession was not such as the law requires to impart notice. (Compare *Thomas v. Kennedy*, 24 Iowa, 397, and *Iowa Loan & Trust Co. v. King*, 58 Iowa, 598.)

3. ——: ——: ESTOPPEL Admitting that plaintiff's possession of the land in question was sufficient to put defendant, when she accepted her mortgage upon the land, upon inquiry as to plaintiff's equities, yet, since plaintiff permitted her son to cultivate the land and dispose of the crops as his own, to execute several prior mortgages on the land, and to execute the mortgage in question, the proceeds of which were used to pay off the prior encumbrances, without in any way disclosing to the world that she claimed any interest in the property, the title to which was all the time in the son, *held* that plaintiff was estopped from asserting her equity as against defendant's mortgage, which was accepted without any actual knowledge of plaintiff's equity.

*Appeal from Polk District Court.* — Hon. Marcus Kavanagh, Jr., Judge.

Filed, October 9, 1889.

Plaintiff filed her bill in equity to set aside a mortgage executed by Bayard T. Lindley to Mary M. Martindale, to restrain the sheriff from making a deed in pursuance of the foreclosure of said mortgage, and to quiet the title in her to three hundred and eighty acres of land in Guthrie county, Iowa, conveyed by said mortgage, on the alleged ground that appellant was the owner and in possession of said lands at the time the mortgage was made, and that the same was made without her knowledge or consent. The facts, as shown by the evidence, and necessary to be noticed, are that appellant was married to Elwood Lindley prior to 1857, and received soon after from her father's estate about five hundred dollars in money and property, which was used in the family; that in 1865 her husband gave her a team of horses, which continued to be used in the family as theretofore, until some time after, when the same were exchanged for one hundred and sixty acres of wild land, near Stuart, the title to which was taken in her name, and the value of which was materially increased by the construction of the Rock Island Railroad, so that it was afterwards sold for thirty-three dollars per acre. With the proceeds of this sale, block 3, consisting of twelve lots, and lot 11, block 17, in Stuart, were purchased. A dwelling was erected and occupied by the family on block 3, and a store building on lot 11, which was occupied by Elwood Lindley as a drugstore. The title to all these lots was taken in Elwood Lindley. In 1874 he conveyed the store property to the plaintiff, and in the same year the plaintiff secured a divorce from him and decree for the title to lot 11 and all of block 3, the homestead of the family. There being judgments against Elwood Lindley that were liens on part of this property, appellant's brother, John Carter, bought the lots at

sheriff's sale, and took mortgages from the appellant, which she afterwards paid. In 1876 appellant and Elwood Lindley were remarried and lived together until 1884. In 1876, lot 11 was exchanged for two hundred acres of the land in question, and, in the spring of 1877, a house was built on said land, and occupied by the Lindley family. The title to this two hundred acres was taken in Bayard T. Lindley, the son of appellant, who lived with the family, and was then about eighteen years of age. The family continued to live in said house until the fall of 1884. In 1882, James Callanan sold by contract, to Bayard T. Lindley, one hundred and twenty acres adjoining said two hundred acres, Elwood Lindley conducting the negotiations; and, in the same year, Elwood Lindley contracted with Mr. Comstock for the other forty acres in controversy. In 1882, Bayard T. Lindley and his wife executed a warranty deed to appellant for the one hundred acres on which the family residence was situated, but which was never placed on record. After his marriage, in 1882, Bayard T. Lindley resided in a house on the land purchased from Callanan. In June, 1884, Elwood Lindley called upon Edward Martindale, agent for his wife, Mary M. Martindale, to secure a loan of five thousand dollars on all the lands in controversy, and a few days thereafter Edward Martindale visited and examined the lands. Elwood Lindley's family were then residing in the same home, and Bayard T. Lindley on the Callanan tract. The plaintiff had been partially blind since 1865. The management and cultivation of the lands had been by Elwood Lindley, and their son Bayard Lindley, from the time they were purchased. A loan of five thousand dollars was consummated on the twelfth day of July, 1884, Bayard T. Lindley and his wife executing the mortgage upon the whole of the lands in controversy to Mary M. Martindale therefor. The moneys received by the loan were applied in part in paying for the lands purchased from Callanan and Comstock, and in paying mortgages placed on the other land by B. T. Lindley. Bayard T. Lindley lived in

the family of his parents on the two hundred acres from the time they moved there until his marriage, in 1882, after which he lived on the Callanan land until after the visit of Mr. Martindale. These facts appear with but little, if any, controversy. There is controversy as to whether plaintiff knew that the title to the two hundred acres was placed in her son. In her original petition she alleged "that she caused the legal title to said lands, as she purchased the same, to be made out in favor of the said B. T. Lindley, then about eighteen years of age." In an amendment, filed after the cause had been submitted, she alleges that the title was placed in B. T. Lindley "without the knowledge or consent of either the said B. T. Lindley or the said plaintiff," and that neither knew the title was so placed until long afterwards. Also it is questioned whether she knew of the execution of the mortgage to Mrs. Martindale, and whether Martindale was told at the time of his visit to the farm that it belonged to Mrs. Lindley. Plaintiff bases her claim for relief on the grounds that, the title to the two hundred acres being vested in Bayard T. Lindley without her knowledge, a trust resulted in her favor, and that he held it in trust for her; that, she being in the actual possession at the time of the execution of the five-thousand-dollar mortgage, Mrs. Martindale and her agent were bound to take notice of her rights in the lands; and that, the mortgage being executed without her knowledge or consent, she is not bound thereby.

*Cole, McVey & Clark*, for appellant.

*Gatch, Connor & Weaver*, for appellees.

GIVEN, C. J.—I.  Appellee presents several questions as to the state of the record, and as to whether there is an appeal as to the defendant B. T. Lindley. We think the merits of the case are fully presented in the record before us, and, as B. T. Lindley has appeared and filed his argument, we have considered the case upon its merits without passing upon these questions.

II. As title to lot 11 (the store-house property in Stuart, which was given in exchange for the two hundred acres) was decreed to plaintiff in her divorce proceedings, we do not inquire back of that in determining whether it was the plaintiff's means that purchased the two hundred acres.

III. The weight of the testimony is in favor of the conclusion that neither the plaintiff nor B. T. Lindley knew at the time of the conveyance that the title to the two hundred acres was placed in B. T. Lindley. She was at the time, at least, partially incapacitated by blindness from transacting business, and this, as well as most of the other transactions, was managed by her husband with her consent. It is evident, however, that she became aware of the fact that the title was in her son long before the execution of the mortgage in question. Her means having paid for the land, and the title being made to the son without her knowledge, the law will imply a trust in her behalf.

*1. TRUST: when implied.*

IV. The doctrine contended for by appellant, that the purchaser of real estate takes the same charged with notice of the equities of the parties in possession at the time of the purchase, is well settled in this state. *Phillips v. Blair*, 38 Iowa, 649, and authorities cited. Such possession "must appear affirmatively to have been open, visible, exclusive and unambiguous; such as is not liable to be misunderstood or misconstrued." 3 Washb. Real. Prop. 284. All these lands had been cared for and cultivated by either Elwood or R. T. Lindley for a long time prior to Mr. Martindale's visit. At the time of his visit, Elwood Lindley, who was negotiating the loan, and his family, were residing on the two hundred acres, and B. T. Lindley on the Callanan tract adjoining. It would certainly not appear from this state of facts, to one who had been told that the title was in B. T. Lindley, that his mother, Mrs. Lindley, was in the open, visible, exclusive and unambiguous possession of the land. The reasonable inference would be that B. T. Lindley, who held the

*2. REAL estate: notice of title from possession: when rule does not hold.*

title, was in possession. Where husband and wife occupy real estate together, the inference would be, in the absence of further information, that it was the husband's possession. *Thomas v. Kennedy*, 24 Iowa, 397; *Trust Co. v. King*, 58 Iowa, 598. In this case the question was as to whether the property was in the possession of Mrs. King or her son. The court held that the legal possession was in Mrs. King and her husband. Where mother and son occupy the property, the same inference as to possession does not arise as where occupied by husband and wife. In the case of King, it was shown that, at the time and after the mortgage was executed, Mrs. King was in the actual possession and occupancy of the property, but it was insisted that her possession was not such as to impart notice to the world of her equities. The property consisted solely of a lot and dwelling thereon, wherein Mrs. King, her husband and family resided. The court says it was a legal possession in Mrs. King and her husband. We think the facts in this case fail to show such a possession in the plaintiff and her husband. Instead of a single lot and dwelling we have several parcels of land, with different dwellings,— lands that had been cultivated and used by others than the plaintiff, and without any apparent authority from her. In *Thomas v. Kennedy*, *supra*, there being no building upon the land, the husband was upon the ground assisting and directing, apparently for himself, the fencing and breaking of the land; no one knowing by any public declaration or act, or otherwise, that the work was being carried on for the wife, nor that the possession taken was for her. The court says: "We are not prepared to hold that under such circumstances third parties would be affected with notice of the wife's possession. In other words, they could as well, and indeed more reasonably, presume that the possession was that of the husband as of the wife; and it would be carrying the doctrine of notice to an unusual extent to hold that the world was, without more, bound to know that he was in possession and making improvements for her." From the facts of this case, one knowing the

relations of the parties, and nothing as to title, would infer that Elwood Lindley was in possession, and, knowing the title to be in B. T. Lindley, would infer that he was in possession. It is contended that Mr. Martindale had actual notice that the lands belonged to Mrs. Lindley. Elwood and B. T. Lindley both testified that, at the time Mr. Martindale visited the farm, Elwood Lindley told him, "in substance, that he would find the title all right in B. T. Lindley, but the farm in fact belonged to Mrs. Lindley." This statement is denied by Mr. Martindale. The truth of this matter is not necessarily determined by the number of witnesses. We think the fact that Martindale, a lawyer, versed in such transactions, made the loan as he did for his wife, without any inquiry or action with reference to the rights of plaintiff, satisfies us that he never understood such a statement to be made. We are not convinced that such a statement was ever made to Martindale. We conclude, therefore, that Martindale made the loan without any knowledge, actual or constructive, of Mrs. Lindley's equities in the land.

V. Assuming, for the purpose of further inquiry, that Mrs. Lindley's possession was such as to put Mr. Martindale upon inquiry, we inquire whether, in permitting the title and control of the lands to remain in her son, as she did, she is not now estopped from asserting her title as against Mrs. Martindale's mortgage. She permitted her son Bayard to cultivate the lands, and dispose of the crops as his own for some time. The deed to Bayard for the two hundred acres was executed October 17, 1876. December 7, following, he mortgaged to Farwell for seven hundred dollars; to Helliker, June 1, 1880, twelve hundred dollars; a second mortgage to Helliker, June 1, 1880, one hundred and twenty dollars; to Dewey, July 17, 1882, nine hundred and eighty-two dollars; and to Martindale, executed June 19, and recorded July 17, 1884, five thousand dollars. The plaintiff knew of the execution of the mortgage to Farwell, December 7, 1876, and thereby learned that the title to the two hundred

*3. ——: ——: estoppel.*

acres was in her son Bayard. She permitted the title to so remain, and her son to exercise control as he did, and to make these mortgages, without in any way disclosing to the world any claim upon the property. Her husband, whom she had at least permitted to act for her in all matters, with her son, who held the legal title, secured five thousand dollars of Mrs. Martindale's money that went to pay for and remove encumbrances from the lands in question, without any actual notice that Mrs. Lindley claimed any interest in the land. It would be most inequitable to allow Mrs. Lindley, under these circumstances, to enjoy the benefits of this loan without any return to Mrs. Martindale. Mrs. Lindley put it in the power of her son to procure this money from Mrs. Martindale, most of which went into the land. Mrs. Martindale made the loan in good faith, and, if either must suffer, it must be the one who made it possible for Bayard T. Lindley to effect a loan upon the lands which he did not own. These conclusions render it unnecessary to notice other points made in the record. The decree of the district court is

AFFIRMED.