J. NORWOOD, Appellee, v. ADDISON M. PARKER et al., Appellants; BANKERS TRUST COMPANY et al., Appellees.

No. 38584.

FEBRUARY 7, 1928.

OPINION ON REHEARING APRIL 5, 1929.

*Carr, Cox, Evans & Riley,* for appellant.

*White & Clarke* and *Wilson & Shaw,* for J. Norwood, appellee.

*Sargent, Gamble & Read,* for Bankers Trust Company, appellee.

MORLING, J.—Plaintiff questions the sufficiency of the evidence to show the existence of a partnership between the grantor, Addison M. Parker, and his co-owner, Hugh M. Shuler, particularly at the time of the execution of the deed in controversy. We are of the opinion, however, notwithstanding some "suspicious circumstances" pointed out by plaintiff, that the existence of a partnership and the ownership of the land in question as partnership property at the time of the execution of the deed to plaintiff are abundantly shown.

The land in controversy consists of two farms, one of 80 acres and one of 120. The 80 acres were purchased and deed taken in the name of the defendant Parker. This deed was recorded. Parker executed a deed of an undivided one-half interest to his co-owner, Shuler, but this deed was never recorded. The deed to the 120 acres, on the purchase thereof, named as grantees H. M. Shuler and Addison M. Parker.

Plaintiff's testimony is that defendant Parker, at plaintiff's house, told plaintiff that he, Parker, was pressed for ready cash, and wanted to borrow $15,000, and that the Iowa National Bank would loan it to Parker, with plaintiff's indorsement; that he, Parker, said "he had the two deeds prepared for these two pieces of land; that Hugh (meaning Hugh M. Shuler) and he owned the

land together, and that he had deeded to me his part of it, which would be good security. He left those deeds with me before he went to his office. My name was inserted in the deeds when he left them with me. I had not talked with Mr. Parker about making out these deeds to me before he came to my house that day. * * * I think I have substantially stated everything that was said'' at that interview. Plaintiff says that he saw Parker a short time afterward at Parker's office, and that:

''We discussed the security that these deeds would give me, and he told me about the amount of the royalties that they were mining from there, and he had a royalty check on his desk, and he showed me what the month's royalty had been prior to that. He stated, if I would indorse with him as additional security, he would either turn over these royalties to me or create a fund and let it accumulate to pay off this note from the royalties as he received them.''

They talked over the mining leases. Plaintiff was shown the lease on the 120, but was told that there was no written lease on the 80 on which the shaft was located. Plaintiff expressed his astonishment, but made no further inquiry. Plaintiff saw one of the royalty checks given by Shuler Coal Company, the lessee. Plaintiff says the check was payable either to Parker ''or Shuler and Parker. I don't remember which.'' Plaintiff was not sure whether he saw the check the day he signed the note or the day he had the deed corrected. Both parcels of land were included in the same deed to plaintiff; but the deed, as Parker made it out, was for the entire interest, instead of an undivided interest. Plaintiff received the deed and signed the note, and, some days after discovering the error in the deed, took it to Parker, who corrected it, to make it read ''an undivided one half of the east one half,'' etc.

The mine was operated by the Shuler Coal Company under lease. Hugh M. Shuler controlled the Shuler Coal Company. The Shuler Coal Company obtained leases before the lands were acquired by the partnership, Parker & Shuler. Parker & Shuler obtained the land in order to get the royalties. Plaintiff, before the transaction in controversy, knew that Parker and Shuler were buying lands together, and supposed they were operating

the lands. He knew that the shaft of the Coal Company was on one of the tracts in question. When he was discussing the royalties on the coal leases with Parker, plaintiff, as above set out, asked Parker what kind of a lease the Shuler Coal Company had on the land. Plaintiff says:

"I don't think I asked him as to Shuler's individual interest in the coal lease. I asked what kind of a lease the Shuler Coal Company had on these lands."

Parker testifies that, before the transaction in controversy, Parker had sold plaintiff a note of Shuler's, and told plaintiff "that it was given to me by Mr. Shuler, to equalize his share with mine in the enterprise,—something of that sort. Mr. Norwood, before the transaction involved here, used to rather good-naturedly refer to my being in the coal business, once in a while. I told him I was not in the operating end of the coal business, but in the royalty end of it; and I think that he agreed with me that that was the better end of it at that time." Plaintiff was well acquainted with Shuler, and knew that Shuler's office was next door to Parker's office. Plaintiff says that, when he received the deed, he had no information that a partnership of any sort existed between Parker and Shuler.

"I knew * * * that Mr. Parker and Mr. Shuler were buying lands together. I knew also that they were operating and running the farms. I did not know that they intended to sell the farms and keep the royalties. I saw one of the royalty checks. I don't know as I made any inquiry of anybody as to what the relationship between them might be * * * When he [Parker] told me they owned them, I did not think it was necessary for further inquiry. If he owned half of it, and Mr. Shuler owned the other half, and he was deeding his half to me, and he told me of the royalties on these lands being leased to the Shuler Coal Company,—in a general way he outlined the ownership. * * * I recall one time Mr. Shuler told me what I understood their relationship to be. I was out in this neighborhood with Mr. Shuler. * * * Going past their holdings, he told me that Parker and he had bought this piece of land. * * * It was near the shaft."

Plaintiff does not claim to have examined or known of the

records in the county recorder's office, or to have relied on anything except Parker's statements.

The information which plaintiff had, according to his own testimony, before he received the deed and signed the note, was that Shuler and Parker "owned the land together." He knew that Parker and Shuler were buying lands together and "buying and running the farms." He knew that the Shuler Coal Company had leases outstanding, on which Parker and Shuler were getting royalties. He knew that one adjustment between Parker and Shuler had been made. He knew that Shuler was interested in the land. He was charged with knowledge of the law, and knew that, even though Parker and Shuler were only tenants in common, their respective interests would be subject to liens in favor of the other for contribution, in case one had advanced on account of the common property more than his share. *McNamara v. McNamara,* 167 Iowa 479. Plaintiff knew that Parker and Shuler were operating not only with respect to the two parcels in controversy, but in other lands, and that they were not only farming the lands, but that at least one mining lease was outstanding, on which Parker and Shuler were getting royalties. The evidence is that the royalty checks (and plaintiff admits seeing one of them at some time) were made out to Parker & Shuler.

We find no evidence that Shuler did or neglected anything to mislead plaintiff, and we discover no reason for plaintiff's not stepping into Shuler's office and finding out from Shuler just what Shuler's interest and equities were. Shuler had made no declarations, and had filed no instrument limiting his interest. Plaintiff was bound to know that Parker's declarations, such as they were, were not binding upon Shuler or Shuler's company. Plaintiff must have had in view the possibility that he might have to enforce the security. In doing so, he would have to cause a sale, not of the entire tract, but of Parker's interest. He knew that, in that event, he might have to buy Parker's interest. He was, in the legal sense, a purchaser (by way of mortgage) of that interest. Plaintiff knew that he was getting only the interest of a tenant in common or partner (joint tenancy being practically obsolete). In any case, Shuler would be entitled to establish his interest. In order to obtain and enjoy Parker's interest in severalty, plaintiff would have to proceed by way of partition or

partnership accounting. In either case, the equities of the co-tenants or copartners would have to be settled. Plaintiff, therefore, was necessarily taking this security subject to adjustment of Shuler's equities. If Shuler's interest was that of tenant in common, and if he had made contributions in excess of his share, Shuler would have had the right to enforce an equitable lien therefor. *McNamara v. McNamara,* 167 Iowa 479; 38 Cyc. 97; 30 Cyc. 237. Plaintiff must be charged with knowledge of the law. When he took the deed and signed the note, his information was that Shuler and Parker "owned the land together," and that the deed was of Parker's "part of it, which would be good security." He knew that the Shuler Company had mining rights and shaft on one of the parcels without written lease on it. He inquired of Parker about the lease. He blindly took it for granted that, because Shuler had an interest in the land, it was of a one-half interest; or, at most, he blindly accepted Parker's statements, knowing, as he was bound to know, that Parker had no authority to bind Shuler. If plaintiff was willing to assume without inquiry that Parker had an unqualified half interest,or if he was willing to implicitly accept Parker's representations, he cannot be heard to complain that the consequences of his own mistaken assumption or confidence should be visited on himself, or not on Shuler. If he intended to hold Shuler to a supposed one-half interest, without right in Shuler to assert equities in the other half interest, good faith would require him to first consult Shuler. While the shares of two or more tenants in common, in the absence of declarations in the deed to the contrary, are presumed to be equal, the presumption is rebuttable, and the actual interest of each may be shown. *In re McConnell,* 197 Fed. 438, 441, and cases there cited. No reason whatever for plaintiff's not going to the little trouble of stepping into the adjoining office and getting information direct from his prospective cotenant appears. Ordinary prudence would dictate such inquiry. If the inquiry had been made, plaintiff would have ascertained the existence of the partnership and of Shuler's equities. Plaintiff clearly had knowledge of such facts as to put him on inquiry. If reasonable inquiry had been made, plaintiff would have ascertained the facts, and he is chargeable with actual notice of those facts. *Johnson v. Chicago, B. & Q. R. Co.,* 202 Iowa 1282, 1288; *Loser v. Plainfield Sav. Bank,* 149 Iowa 672, 676; 46 Corpus

Juris 543. The partnership was engaged in the business of dealing in real estate, and the property in controversy was partnership property. As such, while the legal title was held in common, in equity the realty was, for partnership purposes, personalty, subject to equitable charge for payment of partnership debts and adjustment and settlement of the interests of the partners. An adjustment and settlement of the partnership affairs were prerequisite to the acquisition by either of the partners of an interest in common, and to the right of partition. After such settlement, the partners would be tenants in common, but only in what remained after such settlement. *Curtis v. Reilly,* 188 Iowa 1217; *Western Sec. Co. v. Atlee,* 168 Iowa 650, 656; *Smith v. Smith,* 179 Iowa 1365; *Cooper v. Frederick,* 4 G. Greene 403, 405. Here there were debts and equities which Shuler and, through him, the partnership creditors were entitled to have adjusted and settled, before Parker or those claiming under him individually would have any right of participation; and if plaintiff had followed out the inquiry to which, as a reasonably prudent person, he was put, he would have ascertained the existence of these rights. He cannot plead ignorance of them. Furthermore, Shuler was with Parker not only in possession, but actually known to be a cotenant. 38 Cyc. 74; 39 Cyc. 1718; *Schmidt v. Steinbach,* 193 Mich. 640 (160 N. W. 448). The recording laws have no application to the equities of cotenants, as between each other, or to their consequent right to liens. *McNamara v. McNamara,* 167 Iowa 479; *Pinckney v. Pinckney,* 114 Iowa 441. In *Clark Bros. v. Watson,* 180 Iowa 721, which distinguishes *McNamara v. McNamara,* the claim of a tenant in common, asserted and denied, was not one that grew out of and resulted from the relationship of cotenants. The right there asserted was to subrogation to the lien of a mortgage originally executed by the owners of land, to secure money for the accommodation of another, who was not then, but who afterwards became, a cotenant. As to the claim there in controversy, the litigating parties were held not to be cotenants. The right there asserted against the mortgagees of the undivided interest of the tenant in common was to subrogation to a lien, not of the cotenants, as such, but of a mortgage to a third part on the entire tract. The facts here fall within the holding of the *McNamara* case, and not within that of the *Clark* case.

"Purchasers are bound to use a due degree of caution in making their purchases, or they will not be entitled to protection. *Caveat emptor* is one of the best settled maxims of the law, and applies exclusively to a purchaser. He must take care, and make due inquiries, or he may not be a bona-fide purchaser. He is bound not only by *actual,* but also by *constructive,* notice, which is the same in its effect as actual notice. He must look to the title papers under which he buys, and is charged with notice of all the facts appearing upon their face, or to the knowledge of which anything there appearing will conduct him. He has no right to shut his eyes or his ears to the inlet of information and then say he is a bona-fide purchaser without notice." *Burwell's Admrs. v. Fauber,* 21 Gratt. (Va.) 446, 463, quoted in *Simmons Creek Coal Co. v. Doran,* 142 U. S. 417, 437.

In the latter case, the court adopted the doctrine of *Jones v. Smith,* 1 Hare 43, 55:

"* * * that cases in which constructive notice had been established, resolved themselves into two classes: first, those in which the party charged had actual notice that the property in dispute was in some way affected, and the court has thereupon bound him with constructive notice of facts to a knowledge of which he would have been led by an inquiry into the matters affecting the property, of which he had actual notice; and, secondly, those where the court has been satisfied that the party charged had designedly abstained from inquiry, for the purpose of avoiding notice."

The court proceeds:

"Each case must be governed by its own peculiar circumstances, and in that in hand, we think appellant either had actual knowledge or actual notice of such facts and circumstances as by the exercise of due diligence would have led it to knowledge of complainant's rights, and that, if this were not so, then its ignorance was the result of such gross and culpable negligence that it would be equally bound."

See, also, 11 Corpus Juris 42.

Cases cited by plaintiff, such as *Martin v. Carlisle,* 46 Okla. 268 (148 Pac. 833), *Reynolds v. Ruckman,* 35 Mich. 80, *M'Der-*

*mot v. Laurence,* 7 Serg. & Raw. (Pa.) 438 (10 Am. Dec. 468), are not in harmony with the doctrine of the *McNamara* and other cases which have come before this court. The case now before us also falls within *Schmidt v. Steinbach,* 193 Mich. 640 (160 N. W. 448), decided by the Supreme Court of Michigan, rather than *Reynolds v. Ruckman,* 35 Mich. 80, by that court, here relied on by plaintiff.—*Reversed.*

FAVILLE, KINDIG, WAGNER, and GRIMM, JJ., concur.

STEVENS and DE GRAFF, JJ., dissent.

EVANS, J., not participating.