HELEN SNIEDERS, appellee, v. WILLIAM BRANTSEN, appellant; HENRY SNIEDERS et al., intervenors-appellees.

No. 48404.

(Reported in 60 N.W.2d 779)

NOVEMBER 17, 1953.

Diamond & Jory, of Sheldon, for appellant.

Van Oosterhout, Te Paske & Rens, of Orange City, for appellee and intervenors-appellees.

GARFIELD, J.—This is an action in equity to enjoin defendant from maintaining a private garage built by him on a 13-foot strip of ground claimed by plaintiff and intervenors and for damages for building the garage and destruction of a shade tree and part of a sidewalk. Defendant's cross-petition asks that title to the disputed ground be quieted in him against plaintiff and intervenors. Following trial there was a decree enjoining maintenance of the garage and awarding damages against defendant of $350. Defendant has appealed.

The controversy is over the location of the boundary line between property occupied by plaintiff and that owned by defendant. The disputed strip lies along the west side of plaintiff's homestead which abuts defendant's property on the east. Both properties face south. Defendant contends he bought the ground in question from plaintiff and her husband and that plaintiff and intervenors are estopped from claiming it.

In 1919 plaintiff's husband, S. Snieders, became the owner of "the southeast quarter of block 5 in Schoep's Addition to North Sioux Center, Iowa, as said property is described on the recorded plat thereof." This quarter block is 146 feet east and west by 130 feet north and south. There is a dwelling on the east 78 feet of the quarter block which S. Snieders and his wife, Helen (plaintiff herein), occupied as their homestead until the husband died intestate in November 1948. Helen then continued to occupy the home. The intervenors are the surviving two sons and three daughters of S. Snieders who join with their mother in this action.

July 14, 1948, Mr. and Mrs. Snieders deeded to defendant William Brantsen for $1050 "the west 68 feet of the southeast quarter of block 5 in Schoep's Addition to North Sioux Center, Iowa, according to the recorded plat thereof." Commencing in April 1951 defendant built a dwelling on the ground purchased by him and, east of his dwelling, built the garage in question. The east side of the garage is about 8 feet west of the Snieders dwelling.

South of the garage, which faces south, there was a north-and-south row of four ash trees. To make room for the garage, just before it was built, defendant caused one of these trees to be removed with a bulldozer and two sections or blocks of a cement sidewalk to be destroyed. The garage is 10 by 20 or 22 feet, of wood, on concrete footings, without floor, and cost about $800. The width of the garage between the outside of the eaves seems to be 13 feet.

Along the west side of the quarter block is a north-and-south alley, although no such alley is shown on any plat of the town. Witnesses estimate the width of the alley at from 16 to 19 feet. Defendant fixes it at "about 16 feet." Although no witness at-

tempts to locate the alley exactly, it is probable the center of the alley is near the west line of the southeast quarter block. Thus the east half of the alley occupies the west 8 to 9½ feet of the ground described in the deed to plaintiff. Defendant claims he owns the ground between the east edge of the alley and an imaginary parallel line 68 feet east of the alley. The effect of the decree is that defendant owns only the land described in his deed.

It appears beyond question that the disputed strip is 13 feet wide and its east line is 81 feet east of the west line of the quarter block. Thus, as a matter of fact, defendant claims to own ground about 71½ to 73 feet wide (depending on the width of the alley), not merely 68 feet wide, immediately east of the alley. In other words, defendant's garage occupies 3½ to 5 feet more ground than even he claims to own.

There is little doubt plaintiff and intervenors, not defendant, hold legal title to the disputed strip. Their title is to the southeast quarter block except the portion thereof deeded to defendant—the west 68 feet of the quarter block "according to the recorded plat thereof." As stated, no alley is shown on any plat. The recorded plat divides the block into four equal quarters.

Barringer v. Davis, 141 Iowa 419, 433, 434, 120 N.W. 65, 70, quotes this with approval from Cragin v. Powell, 128 U.S. 691, 696, 9 S. Ct. 203, 205, 32 L. Ed. 566, 567: "* * * it is said to be 'a well-settled principle that when lands are granted according to an official plat * * * the plat itself * * * becomes a part of the grant or deed by which they are conveyed, and controls, so far as limits are concerned, * * *.' " To like effect are Quade v. Pillard, 135 Iowa 359, 363, 112 N.W. 646; Park Commissioners v. Taylor, 133 Iowa 453, 459, 108 N.W. 927; Young v. Cosgrove, 83 Iowa 682, 683, 49 N.W. 1040.

No claim is made for reformation of the deed to defendant or for damages for breach of any covenant therein. As above indicated, defendant contends plaintiff and intervenors are estopped from claiming the disputed ground. His cross-petition alleges as a basis for the estoppel that he always believed he was the owner of a lot which extended 68 feet east of the alley, George Snieders (one of the five intervenors) informed defendant he

owned such a strip and pointed it out to defendant just before he built the garage, plaintiff watched the garage being built and made no objection to its location.

Herrick v. Moore, 185 Iowa 828, 832, 833, 169 N.W. 741, 742, cited by defendant, thus states the theory of estoppel upon which defendant relies: " * * * where one has invaded the right of another, thinking he is within his own right, and that invasion is known to the other, and the other stands by and sees him make valuable improvements upon the invaded territory, under the supposition that it is a part of the possessions of the invader, equity will thereafter deny to the invaded the right to object to the invasion, and will not grant his prayer to have the improvements destroyed or removed, when such act would be greatly to the prejudice of the invader."

The cited case also expresses the same thought in this way (pages 837, 838 of 185 Iowa) : " * * * should a property owner see his neighbor, in good faith, assume a line to be the true line, and act upon that assumption, and build valuable improvements, and he makes no objection, and consents to the neighbor's so doing, the law steps in and says: * * * 'You are estopped.' "

To like effect are Minear v. Keith Furnace Co., 213 Iowa 663, 669, 239 N.W. 584, 586; Hart v. Worthington, 238 Iowa 1205, 1220, 30 N.W.2d 306, 314 (the Minear and Hart cases repeat the first of the above quotations from Herrick v. Moore, supra) ; McCartney v. Schuette, 243 Iowa 1358, 1362, 54 N.W.2d 462, 464; Annotation 76 A. L. R. 304; 19 Am. Jur., Estoppel, section 133, page 307.

The cited authorities and many others make it plain there is no estoppel unless the one erecting the improvement does so in the good-faith belief he is within his rights in so doing. 31 C.J.S., Estoppel, section 88, says, "There can be no estoppel where the party claiming it was fully cognizant that he was invading the rights of another, or where he was not justified in believing he had title to the rights involved."

The annotation in 76 A.L.R. 304, 310, cites many decisions for the proposition, also stated in 19 Am. Jur., Estoppel, section 133, page 788, that estoppel "cannot be invoked by one who, at the time the improvements were made, was acquainted with the true character of his own title or with the fact that he had none."

In Shanks v. Seamonds & Campbell, 24 Iowa 131, 133, 92 Am. Dec. 465, 466, one ground for rejecting the defense of estoppel is that "defendants were advised and told at the time of building, that they had no title, and, in the face of this information, proceeded with their improvements."

Of course the burden rested upon defendant to prove his defense of estoppel. The trial court held he failed to do so. Although our review is de novo we are justified in giving weight to the trial court's decision. The case involves quite largely disputed fact questions. See Salem v. Salem, 245 Iowa 62, 60 N.W.2d 772, and citations. We are not persuaded a different conclusion should be reached. We think it does not appear defendant erected his garage in the good-faith belief he owned the strip in controversy. On the contrary he was informed he did not own it, plaintiff claimed it and he proceeded to build the garage in the face of this information.

Defendant purchased the lot in response to an advertisement in a local newspaper which said "We have a choice lot (about 68x130) for sale and on it is a large 18x22 double garage and a small 6x8 building suitable for feed shed." Defendant looked over the ground alone before he purchased and was fully aware of the existence of the alley. He never talked to the vendor S. Snieders about the ground he bought. Defendant was furnished an abstract of title which he had examined by an attorney.

Soon after defendant purchased his lot the Snieders moved therefrom a chicken coop (about 10x12 feet) and placed it partly on the 13-foot strip now in controversy, north of where the garage now sits. A cement sidewalk was built, partly on the strip, from the north (rear) of the Snieders dwelling to this chicken coop. Defendant destroyed two sections or blocks of this sidewalk to make room for the garage.

It was nearly three years after defendant purchased his lot that he commenced to build his house and garage. He did nothing during this period to indicate he claimed the 13-foot strip. He made no objection to the Snieders' placing their chicken coop partly on it or to the presence of the sidewalk leading to the coop. Plaintiff caused the grass on the strip to be mowed as part of her lawn and the snow to be shoveled from the sidewalk along the street in front of the strip.

Defendant testifies that before he started his house or garage he went to George and Henry Snieders, the two intervenors who live in Sioux Center, and "asked them to measure the ground so I would know how far east I could go." Henry Snieders says that on this occasion, before the tree was removed, "Mr. Brantsen claimed he didn't have enough room to build." George Snieders testifies defendant "came to me and said he didn't have enough room to build there and I said I couldn't help that, he bought 68 feet and that was what he was getting, he wanted me to go along to measure it and I did. I called my brother Henry and he went with us."

At defendant's suggestion he and George Snieders talked to the mayor of the town regarding the boundary lines on the east and west of defendant's lot. The mayor is an attorney who has regularly performed legal services for defendant. Because of possible conflict of interest between the town, which claimed the alley, and defendant, the mayor suggested that defendant get other legal advice. There was talk of the town's surrendering two feet of the alley and the Snieders' conveying to defendant two feet from their west line but no agreement to that effect was reached.

After seeing the mayor, defendant with George and Henry Snieders went to measure the ground purchased by defendant. As suggested by the mayor, they measured 68 feet east from a point a foot east of a utility pole near the east side of the alley. Such a measurement included most or perhaps all of the disputed strip and the row of four ash trees above-mentioned. Both George and Henry Snieders testify, however, they then told defendant this measurement was from the wrong place, that the true line between them was about three feet west of the row of trees and there was no intention to sell any ground east of such line. (Incidentally the description of the lot in the newspaper advertisement did not say the trees were located on it.)

With knowledge that the Snieders claimed the east 78 feet of the quarter block, including the four trees, defendant caused a bulldozer to remove one of the trees, destroyed part of the sidewalk leading to the chicken coop and built the garage on the west 13 feet of the east 78 feet of the quarter block. It took only

about three days to build it. Plaintiff is eighty-three and lives alone with an elderly lady roomer. Plaintiff did not know defendant intended to remove the tree and it was out before she knew about it. Plaintiff says "I rushed outside and meant to say a whole lot but I was so stunned I didn't say anything to anyone."

P. DeVries, a county supervisor for twenty-one years, is plaintiff's next-door neighbor on the northeast corner of the block. Plaintiff told DeVries about removal of the tree and asked his help that same day or possibly the next day when part of the sidewalk was being destroyed. DeVries got the town clerk and the two measured the 78 feet of plaintiff's from the monument at the southeast corner of block 5. Defendant was present at the time or soon afterwards and knew of the measurement. DeVries says he then told defendant plaintiff's property extended to a line west of the trees and suggested he see plaintiff, but defendant replied, " 'I have nothing to do with that old woman.' " This was still the same day or the day after the tree was removed, before construction of the garage had progressed very far if at all. Defendant denies he made the quoted statement to DeVries. He testifies, however, "I had a talk with Mr. DeVries after the foundation of the garage was in. He asked if we weren't close to the house and then I said to the carpenters to wait a few seconds as there might be trouble."

It is true defendant says George Snieders and DeVries both said, in effect, it was all right to build the garage on the disputed strip. George and DeVries deny this however. Defendant also testifies he would not have built the garage where he did if he had known there was a dispute over ownership of the ground.

Plaintiff and DeVries say that while defendant was painting the garage he told plaintiff in DeVries' presence he made a mistake and was sorry. Defendant denies he made the statement. The man who removed the tree with the bulldozer, a witness for defendant, testifies that when plaintiff came out of her house when the tree fell he "thought from the expression of her face she didn't like it" and he told defendant he had better wait before removing the other three trees. (Defendant had engaged him to take out all four trees.) Only the one tree was removed.

Within a few days from the time the garage was built or perhaps during its construction plaintiff's attorneys were consulted. They wrote defendant on April 23 asking settlement of the damages claimed by plaintiff.

We deem further extended reference to the evidence unnecessary. We think it appears defendant was fully aware of the true character of his title and that he had no legal title to the disputed ground. While defendant professed to own the strip, his actions plainly indicate he knew the Snieders were insisting it belonged to them. If defendant believed he owned the ground in question he had no good reason to go to George and Henry Snieders or the mayor regarding the boundary before he commenced to build.

At best defendant must have known ownership of the strip was in dispute. Without waiting for the dispute to be settled and without giving adequate warning he proceeded to have the tree removed, to destroy part of the sidewalk and build the garage within a few days. We cannot find defendant built the garage in the good-faith belief or assumption he owned the ground in question. If he had such belief he was not justified in it.

Nor can we say plaintiff stood idly by and made no objection to the building of the garage and the preparations therefor. Her conduct when the tree was removed was such that the operator of the bulldozer understood she did not like what had been done and he advised defendant to wait before taking out the other trees. Plaintiff promptly solicited the aid of DeVries who objected to defendant regarding the location of the garage before large expense for it had been incurred.

Further, there is no showing any of the intervenors (who owned two-thirds interest in the Snieders property) knew what defendant was doing about the garage until after it was done. This is especially true as to three of the five intervenors who live away from Sioux Center. George and Henry live in another part of the town.—Affirmed.

All JUSTICES concur.