WASTEEN SALEM, appellee, v. A. J. SALEM et al., appellants.

No. 48390.

(Reported in 60 N.W.2d 772)

NOVEMBER 17, 1953.

Gill & Gill, of Sioux City, for appellant A. J. Salem.

M. E. Rawlings, of Sioux City, for appellant Rose Eckrosh.

Whicher & Davis, of Sioux City, for appellee.

THOMPSON, J.—Plaintiff's petition is in three counts. The first alleges a confidential relationship between plaintiff and defendant A. J. Salem, in which the latter was the dominating party; it pleads fraud, both active and constructive, in procuring plaintiff's signature to a deed to a valuable parcel of residence property in Sioux City, and alleges a mortgage given by A. J. Salem to defendant Rose Eckrosh to be likewise fraudulent. Count II repeats the factual allegations of Count I and charges undue influence exercised by A. J. Salem in securing the conveyance. Count III alleges duress. The prayer of each count is that the deed be canceled and title to the realty be quieted in plaintiff, and the mortgage running to Rose Eckrosh be likewise canceled

of record. There is an alternative prayer asking, if said mortgage be found to be a valid and subsisting lien, plaintiff have judgment against defendant Salem for the amount thereof.

By way of answer defendant A. J. Salem traverses the material allegations of fact set out in each count, alleges the real estate was purchased entirely with his funds, plaintiff holding title prior to the conveyance to him as a trustee only, denies all charges of fraud, undue influence or duress, and says as to the mortgage to defendant Eckrosh that it represents a bona fide indebtedness to her and her family and denies all charges of fraud in connection therewith.

Defendant Rose Eckrosh likewise filed her answer, the material part of which is that she denies any fraud in connection with the mortgage, and alleges it was given for a good and valuable consideration and is a good and valid instrument.

The trial court, after hearing the evidence, found in favor of the plaintiff on all issues and entered its decree and judgment canceling the deed to A. J. Salem and the mortgage to Rose Eckrosh, and quieting title in plaintiff. Both defendants have appealed.

The defendants have joined in their appeal and in their appellants' brief and argument and reply brief and argument. They assert these propositions relied upon for reversal: (1) The court was in error "in finding A. J. Salem was a positive and determined character"; (2) the court was in error in holding A. J. Salem failed to overcome the presumption against validity of the conveyance because of the confidential relationship between himself and the plaintiff; (3) the court was in error in failing to grant A. J. Salem an equitable lien on the real estate because of certain advancements he had made for repairs, improvements and taxes; and (4) the court erred in holding the mortgage to Rose Eckrosh was invalid and was not a lien upon the property involved herein. The first and second propositions noted above are listed in reverse order in defendants-appellants' brief, but we prefer to discuss them as we have noted them.

I. If the proposition first noted above has any meaning, it must be taken to be a contention that A. J. Salem was not the dominating personality in his relations with the plaintiff, and

so there is no occasion for the application of the familiar rule which throws upon the dominant character in a confidential relationship the burden of proving the fairness of any transactions between them. It may well be doubted that the proposition, as stated, means anything significant here. It says only that A. J. Salem was not a positive and determined character. Even if this were true it would not demonstrate he was not the dominant party in his relations with the plaintiff. The point is only briefly argued by the defendants and we shall content ourselves with saying that if we take the proposition to be a denial of confidential relations between plaintiff and defendant Salem, or defendant was the dominating party therein, or both, the record shows otherwise. Defendant Salem, in his answer, admits plaintiff has always reposed trust and confidence in him, and says confidence was justly merited. This seems to be an admission of the confidential relationship, leaving only the question of dominance to be determined. But we think dominance by defendant Salem over the plaintiff was clearly established. Much of the evidence referred to in Division II bears upon this point and we shall not set it out here.

II. The appellants' propositions for reversal, Nos. 2 and 3, concern only issues between plaintiff and defendant A. J. Salem. We shall, therefore, in our discussion under these divisions refer to A. J. Salem as though he were the sole defendant.

The plaintiff and defendant are sister and brother. At the time of the trial plaintiff was fifty-eight years of age and defendant was sixty-eight. The defendant Rose Eckrosh is also a sister of the other parties. The defendant came to the United States from Syria in 1902 with the sister Rose Eckrosh. In 1908 he brought his mother, another sister Sofia, and the plaintiff, who was then thirteen years of age, from Syria to Iowa. The plaintiff had no formal education, either in Syria or America. Her testimony is that she cannot read or write the English language; she can only write her name. The defendant says she can read typing and "knows her ABCs." In any event, it is apparent from the record she has little if any command of written English and is far from adept in the spoken language. In 1917 she was married to a cousin, John Salem. She lived most of her married life in

South Dakota. Her husband died in Des Moines in 1926. He left her $6500 in life insurance, a house in Centerville, South Dakota, and a small farm near O'Neill, Nebraska. There was also an indebtedness due from another cousin which she testifies was afterward paid to her in the sum of $1000. In 1927 she moved to Sioux City with her family of three daughters. The defendant has never married. After working in a bakery for a time he operated a grocery store in Des Moines for six years, then came to Sioux City in 1920 and from that time has conducted a retail grocery business in Sioux City, and since 1950 in the suburb of Leeds. Since about 1929 the plaintiff with her family and the defendant lived in the same house, until the present trouble developed in 1952.

Shortly after the plaintiff came to Sioux City in 1927 she purchased a house on Twelfth Street. She says it was purchased upon the defendant's advice, all the arrangements being made by him and the plaintiff doing whatever he told her in the way of furnishing the money to make the payment. Defendant does not deny this. She rented the house to others for a time, but eventually moved into it. Defendant lived upstairs. It was a duplex house and plaintiff got the rent from the other side. Defendant furnished the groceries for the family and plaintiff helped him in his store.

At one time the house on Twelfth Street was damaged by fire, and insurance of $1700 was paid. Plaintiff testifies the defendant got this money. The cost of repairs was only $600, leaving a balance of $1100 in defendant's hands. As a witness for himself he does not deny this. Plaintiff also tells us she sold her house in Centerville, South Dakota, for $1000 at defendant's insistence, with him making all the arrangements; and her farm in Nebraska for $1200 in the same way. This money, she says, was received and kept by defendant. This, also, he does not deny.

In 1944 upon defendant's advice, or demand, plaintiff decided to sell the house on Twelfth Street. The defendant listed it for sale with a firm of realtors and it was eventually sold for $4000. Plaintiff says, and defendant denies, that this money was also received by him. About this time plaintiff rented a safe-deposit box. It is undisputed that shortly after the sale of this house defendant gave plaintiff two sealed envelopes containing money

which she put in her safe-deposit box. She did not open the envelopes. She testified defendant told her it was her money which he had been holding for her. He says it was his own money which he had had in a suitcase. Since he says, at another point, he had a checking account in a bank until 1950, it is not readily apparent why he kept the money in a suitcase or why he gave it to plaintiff to care for when he could have deposited it in his bank account. One of the major controversies between the parties concerns these envelopes, but it is a side issue and is material only for what light it throws on the source of the money which went into the purchase of the house involved in this suit, and on the credibility of the parties. The testimony of neither concerning it is entirely reasonable.

After the sale of the house on Twelfth Street the plaintiff began looking for another house which she could purchase. She looked at several places, but, she testifies, the defendant did not like them and told her not to buy. When she was out of town for a few days she says the defendant contracted to buy for her the property involved herein, known as 2611 Nebraska Street. He says she selected the property; but it is undisputed he made the down payment of $1000. Their versions differ widely as to what happened thereafter. She says she did not want the house but her brother told her he had $1000 invested which he would lose if she refused to go ahead with the transaction so she gave him the money—largely made up of the contents of the two envelopes from the deposit box—to make the purchase, the price being $8000. He says she refused to take the house and so he decided to buy it himself, and the entire purchase price was paid with his own money.

The deed to the place was taken in plaintiff's name and the opinion upon examination of the abstract of title was addressed to her. The parties moved into the house and continued to live there under substantially the same arrangements as before, until shortly before this litigation was commenced. The reason given by defendant for taking the title in the name of the plaintiff was that "I might have an accident or trouble and someone could take the house from me." This seems to mean he was keeping it out of reach of potential creditors.

In 1950, at the request of the defendant, the plaintiff executed to him a conveyance of the real estate in question. She says she did it in reliance upon him, and because he told her she might be killed in an automobile trip she was about to take and he would then make over the property to her daughter. She fixes the date of this deed as October 1950, while the deed itself bears the date of March of the same year. Why this deed was not used by the defendant is not apparent. In any event, in October 1951 he again asked her to execute a deed and she did so. She testifies he again warned her of the perils of a journey by automobile. It is evident each deed was requested and executed without the aid of any third person. The defendant approached his sister each time when she was alone. Her daughter, Carmelita, was a secretary in a law office in Sioux City but she was not told of the transactions at the time, nor asked to help with them. At this time the cordial relations between the defendant and his sister and her family still existed. The notaries who acknowledged plaintiff's signatures to the two deeds were not present when she signed them, although one of them called her and verified her signature before affixing his jurat.

On October 23, 1952, over a year after its execution, defendant filed the second of the two deeds for record. He first affixed $11 in revenue stamps on which someone wrote the plaintiff's initials as cancellation marks. It is not claimed plaintiff initialed the stamps. On the next day plaintiff's daughter, the law-office employee, saw the note of the recording in the Daily Reporter. This, with the recording of a mortgage to Rose Eckrosh a few days later, brought the matter to a focus and the present suit was started shortly thereafter.

Plaintiff and her daughters all testify the defendant was the controlling influence in their family life while they lived together. They say they relied upon him for advice and guidance in all matters and his word was law. While defendant denies he was dictatorial or dominating, we think the weight of the evidence and his own admission in pleading that the confidential relationship existed is much against him and fully supports the trial court's finding on this point. Once the confidential relation is admitted or proven, it is a rare case indeed in which there is not a dominant and a subservient party. Seldom are the parties

on an equal footing, and it was so here. The plaintiff, a woman of no education and entirely lacking in business experience, with only a halting and uncertain command of the English language, naturally leaned heavily upon her brother. He was a business-man—not a tycoon, it is true, but nevertheless one accustomed to commercial affairs and far more capable in such matters than his sister.

We have set out some of the material points of the testimony above. It would serve no good purpose to go into further detail. There are many things disclosed by the evidence which throw doubt upon the accuracy of the testimony on both sides. Counsel for the respective parties have each found a fertile field for their arguments showing the unreliability of the proof offered by the opposition. With many of these contentions on each side we are much inclined to agree. We have pointed out some of the incon-sistencies and non sequiturs above. There is also the testimony of three women who called upon plaintiff after the commence-ment of the litigation, who say she admitted the house was pur-chased with defendant's money. But the difficulty which plaintiff plainly encountered in her use of English makes inadvisable the giving of much weight to any claimed admissions.

The determining point is, of course, whose money bought and paid for the house. Defendant does not claim he paid plain-tiff anything at the time she executed the deeds, although the needless placing of revenue stamps upon them makes it appear he wished to give that impression at the time. We realize the grave danger of doing a serious injustice to someone in a case of this kind. Both parties cannot be right; both cannot prevail. It may be, considering the matter as best the courts can, that their determination will result in supporting an unjust and fraudulent claim on the one hand, or denying justice and aiding the corrupt in enjoying the fruits of his fraud on the other. We can only apply the rules which long experience has taught will oftenest serve the ends of justice in these cases. We cannot be certain of what transpired between these people. The question at this point is factual and the seeker for truth finds himself lost in a maze of uncertainty and confusion.

In the state of the record, with its inconsistencies, its contradictions and its showing of acts by all parties which do

not accord with the usual conduct of people in handling their affairs, we turn first to the rule which places the burden of proof upon the dominant party in a confidential relationship to show the fairness of his acts. In re Estate of Lundvall, 242 Iowa 430, 46 N.W.2d 535, and authorities cited therein at pages 438 and 439 of the Iowa citation.

The second established principle which aids us here is that in an equity action when the question is one of fact and turns much upon the credibility of the witnesses, we give weight to the findings of the trial court. In Meier v. Johannsen, 242 Iowa 665, 673, 47 N.W.2d 793, 797, we said: "While the case was in equity, and is here before us for trial de novo, it is peculiarly one of that class in which we give considerable weight to the findings of the trial court upon fact questions. The credibility of the witnesses had much to do with the weight to be given to defendants' evidence * * *."

The rule is well stated in Hatheway v. Hanson, 230 Iowa 386, 396, 297 N.W. 824, 828: "This case resolves itself in the final analysis on the credibility of the witnesses. We have repeatedly recognized that, even though an action in equity is triable here de novo, since the trial court has the witnesses before him and is in far better position to judge their credibility, considerable weight is given to the findings of the trial court on such issue. In re Estate of Brooks, 229 Iowa 485, 492, 493, 294 N.W. 735, and cases cited. This is particularly true where the good faith of a party is in issue." See also Snieders v. Brantsen, 245 Iowa 81, 60 N.W.2d 779.

The application of these two rules indicates the necessity for a finding for the plaintiff. The defendant has failed to carry the burden of showing the transaction by which he obtained the deed from the plaintiff was fair and free from fraud. It is not necessary to determine whether he used undue influence or duress; plaintiff is at least entitled to recover on Count I of her petition so we need not concern ourselves with Counts II and III.

The defendant cites Sinclair v. Allender, 238 Iowa 212, 222, 26 N.W.2d 320, 326, and urges in connection therewith the well-established rule that legal title should not be divested upon parol testimony, except it be clear, satisfactory and convincing.

The rule has no application here. It collides with, and must yield to, the legal principle above set out which places the burden of proof upon the dominant party in a confidential or fiduciary relationship to establish the good faith and fairness of a transaction between him and the weaker and subservient one.

■■ III. Defendant's third proposition which he thinks shows error on the part of the trial court is that he should at least have been granted an equitable lien for money expended for repairs, improvements and taxes on the disputed property. But defendant's answers to each count of the petition pray only for its dismissal. There is no slightest indication of any request for affirmative relief. He took issue squarely upon the question of ownership of the property and his right to retain the legal title. At all times he has contended the money which bought the realty was his, and that plaintiff contributed nothing thereto. So far as the record shows the lower court was at no time apprised by pleading or otherwise that he was claiming any equitable lien for improvements or other advances. There is some evidence he made such advances, but so far as can be determined from the record before us he urged this only as proof the property was at all times his. We have often said that propositions not raised in the trial court will not be considered on appeal. Stolar v. Turner, 237 Iowa 593, 606, 21 N.W.2d 544; New Amsterdam Casualty Co. v. Bookhart, 212 Iowa 994, 1001, 235 N.W. 74, 76 A. L. R. 897.

■ It is also the general rule that a defendant seeking affirmative relief must proceed by cross-bill. 30 C. J. S., Equity, section 372, page 786. There are some exceptions, but none which meets the situation here. The rule is followed and applied in a series of early Iowa cases: Holladay v. Johnson, 12 Iowa 563, 565; MacGregor v. MacGregor, 9 Iowa 65, 77; Armstrong v. Pierson, 5 (Clarke) Iowa 317, 323; and Compton v. Comer, 4 (Clarke) Iowa 577, 581. Whether the rigid rule that no affirmative relief may be asked in the answer but must be asked by cross-bill would be followed under modern practice we need not decide. We think there must be at least something pleaded by the defendant to apprise the trial court of his claims.

■ The defendant urges us, however, if we find the plaintiff furnished the funds, or a substantial part thereof, for the purchase of the property, to say the parties cannot be restored to their former condition and plaintiff is entitled only to a money judgment rather than the cancellation of the deed. We are cited to McGaffee v. McGaffee, 244 Iowa 879, 890, 56 N.W.2d 36, 41. It is true in Division VI of the first opinion in the McGaffee case we found a money judgment was the only relief we could give the plaintiff. The rule is as defendant contends, but of course its application depends upon the facts in each case. In fact, in the McGaffee case we granted a rehearing on this point and later found the property in controversy should be restored to plaintiff rather than to grant him a money judgment. McGaffee v. McGaffee, 244 Iowa 890, 58 N.W.2d 357. We see no occasion for the application of the rule here; the original status quo can clearly be restored by the cancellation of the conveyance.

IV. The final proposition relied upon for reversal is joined in by both defendants. It asserts the trial court should have held the mortgage running to defendant Rose Eckrosh to be a valid lien. It appears the money represented by the mortgage, if any was in fact loaned, was advanced before defendant Salem acquired the title to the realty involved here. Joan Hazer, a daughter of plaintiff and a witness for her, testified defendant Salem told her he had not gotten any money from defendant Eckrosh for it; he put it on "to protect himself against an accident of any kind or a lawsuit." Defendant Salem denies this. He says the sum of $6000 shown in the mortgage was made up of a loan of $5000 by Joseph Eckrosh, husband of Rose Eckrosh, in 1950; a loan of $500 by Fred Eckrosh, a son of Joseph and Rose, in the same year; and two year's interest on these sums. It is evident the loans were made before Salem had record title to the property. The defendant Salem further testifies to a talk with Joseph Eckrosh at the time of the $5000 loan:

"Well, the talk was about the mortgage, and I told him the house recorded my sister's name, and when I show him the note he say, 'That don't make any difference anyway. We can trust you. Any time you got the house in your name, *if you want to*, you can send me mortgage, whatever you want.' " (Italics supplied)

Again, this witness says: "Fred and Rose Eckrosh knew that Wasteen and I were having an argument at the time the note and mortgage were made." It appears the note and mortgage were made to Rose Eckrosh by direction of her husband, Joseph, and her son, Fred; or at least such is the testimony of Salem. It is somewhat significant that although Rose Eckrosh appeared by counsel and filed her answer and her attorney took part in the trial and in this appeal, none of the Eckroshes were called as witnesses in the case and we do not have the benefit of their testimony, which might have thrown considerable light on this feature of the case at least.

█ A mortgagee who takes to secure a pre-existing debt is not a bona fide purchaser. Rea v. Wilson, 112 Iowa 517, 520, 84 N.W. 539; Koon v. Tramel, 71 Iowa 132, 32 N.W. 243; Port v. Embree, 54 Iowa 14, 6 N.W. 83. The defendants cite and rely upon Lindley v. Martindale, 78 Iowa 379, 43 N.W. 233. But there the plaintiff had permitted title to real estate which she claimed to own to rest in the name of her son, who executed a mortgage for a present consideration. The case is not helpful to defendants.

█ Not only was the consideration for the mortgage advanced some years before the mortgage was executed and before defendant Salem had record title to the realty, but his own testimony shows the mortgagees at the time of the advancement of the principal part of the loan told him he might give the mortgage or not, as he wished, when he obtained title. They trusted him to repay with or without the security of the mortgage. Even more destructive of any right to claim under the mortgage under the circumstances here is the fact, testified to also by Salem, that Rose and Fred Eckrosh knew when the mortgage was made there was trouble about the property. This again appears from the testimony of A. J. Salem above set out. Justice Bliss, speaking for this court in Rance v. Gaddis, 226 Iowa 531, 545, 284 N.W. 468, 475, said:

"The rule is and should be that if a prospective mortgagee has the notice or knowledge, above stated, of rights in the mortgaged property, adverse, prior, or superior to the right or title of the mortgagor, and then advances money to the mort-

gagor, it does so at its peril, and subject to any such superior rights or title. 2 Pomeroy Eq. Jur., 3d Ed., sections 659–665, section 646, sections 750 to 762; Norwood v. Parker, 208 Iowa 62, 224 N.W. 831; Millowners Mut. Life Ins. Co. v. Goff, 210 Iowa 1188, 232 N.W. 504; Aultman v. Kennedy, 114 Iowa 444, 87 N.W. 435, 89 Am. St. Rep. 373."

Since the Eckroshes had notice there was trouble over the property between plaintiff and their mortgagor, they took their mortgage subject to whatever rights plaintiff might establish. A reasonable and diligent inquiry would readily have apprised them of plaintiff's claim, and they were put on notice to make such inquiry.

We find no error in the decree and judgment of the district court.—Affirmed on both appeals.

All JUSTICES concur.